**SOUTHWEST SAVINGS ASSOCIATION, Appellant,**

v.

**Billy A. DUNAGAN et al., Appellees.**

**No. 16595.**

Court of Civil Appeals of Texas.

Dallas.

June 11, 1965.

Rehearing Denied July 9, 1965.

DeBusk & DeBusk, and Kilgore & Kilgore, James A. Kilgore, Dallas, for appellant.

Lester L. May, Thomas D. Reagor, Goldberg, Gump, Strauss & Hauer, James L. Mitchell; Erhard, Cox & Ruebel, Robert C. Cox, Storey, Armstrong & Steger, Donald W. Jackson, Dallas, for appellees.

WILLIAMS, Justice.

This appeal involves summary judgment proceedings in a suit brought by Southwest Savings Association against Billy A. Dunagan and a number of other defendants to recover upon a written guaranty agreement. The trial court sustained motions by the several defendants, either for summary judgment or for dismissal, and overruled the motion for summary judgment by Southwest Savings Association. From a take-nothing judgment rendered in favor of all defendants plaintiff appeals.

Appellant's assault upon the judgment is implimented by ten points of error, such points being of such a nature that an intelligent consideration thereof requires a recitation, in some detail, of the material antecedent facts.

## FACTS

The essential facts recited herein are undisputed and are revealed by various depositions and exhibits attached thereto, together with responses to requests for admissions of fact.

Billy A. Dunagan originally conceived the idea of a country club to be established in the northern part of Dallas County. He broached the subject to H. Leslie Hill and from their initial talks a plan evolved to acquire a block of land in the neighborhood of Garland, a portion of which would be used for the country club and golf course and the remainder of which would be used by developing the same for residential and commercial use. Ed Drake, an attorney who had represented Dunagan's advertising agency, was called upon to do the necessary legal work in connection with forming the legal entities to carry out the plans. Four separate legal entities were created.

1. The Buckingham Joint Venture was a voluntary association organized for the purpose of acquiring land. The affairs of the joint venture were to be managed by H. Leslie Hill and Billy A. Dunagan, as agents for the joint venturers under the terms of a joint venture agreement which expressly provided that Hill and Dunagan, as agents, would have the power to bind the assets of the joint venture by contract, but that they had no power to bind the assets of the members of the joint venture individually.

2. Roanoke Development Company, a business corporation, was formed to own and develop the properties which would not be used for the country club.

3. Buckingham Country Club was a nonprofit corporation organized to own the actual country club facilities.

4. The Buckingham Management Corporation was a business corporation organized for profit to manage the country club property and to supervise the construction and maintenance of the improvements placed upon the country club property.

All of the appellees held some type of membership in Buckingham Country Club. All of appellees, except C. C. Huffhines, were parties to the Buckingham Joint Venture agreement. Throughout the formative stages and through the acquisition of the properties, the affairs of the organizing group were held at informal meetings. Those participating in these meetings included Billy A. Dunagan, H. Leslie Hill, Ed Drake, C. W. Cassidy, Jr., Arthur White, DeWitt Ray, Jr., J. J. Freiberger, and J. W. Campbell. H. Leslie Hill was in charge of planning and carrying out the construction of the country club buildings. Billy Dunagan was in charge of publicity and the solicitation of membership.

Some time prior to the fall of 1960, H. Leslie Hill, as general contractor, commenced the erection of the country club building. Initial construction was financed in the name of Buckingham Management Corporation which used a portion of the initiation fees paid by members for that purpose. Finally it was decided by Buckingham Management Corporation to borrow $200,000 to complete improvements on the country club property.

There is evidence that other lending agencies were approached but finally Southwest Savings Association was brought into the picture by DeWitt Ray, Jr. and became interested in making the loan. Following negotiations by attorney Ed Drake, representing Buckingham Management Corporation, a letter dated October 14, 1960, addressed to Southwest Savings Association, was written by Ed Drake wherein he proposed that a loan of $200,000 be made to Buckingham Management Corporation, the note therefor to be endorsed by DeWitt Ray, Jr., C. W. Cassidy, Jr., H. Leslie Hill, J. J. Freiberger, Ed Drake and Billy A.

Dunagan. It is undisputed that Drake had authority from these parties to write the letter. On October 28, 1960, following additional negotiations, Ed Drake addressed another letter to Mr. L. E. Guillot, President of Southwest Savings Association, wherein it was proposed that a loan of $200,000 be made to Buckingham Management Corporation, to be secured by a deed of trust upon 217.0134 acres of land, and an agreement to give a lien upon additional lands totaling 182.64 acres then held under option. It was therein proposed that the loan was to be further secured by a collateral guaranty agreement to be signed by C. W. Cassidy, Jr. and others interested in the project, their guaranty liability being limited by the amount expressly stated in the agreement. The letter of October 28th was signed "Buckingham Management Corporation by Edward J. Drake, Secretary." When asked in his deposition concerning the writing of the two letters above referred to and as to whether he had any authority to represent the individual guarantors in making the proposals, Ed Drake testified that he did not represent any of the individuals but only represented the joint venture and the management corporation. On October 31, 1960 Southwest Savings Association issued a loan commitment for a loan in the amount of $200,000 to be made to Buckingham Management Corporation. On November 25, 1960 Southwest Savings Association issued a letter of instructions addressed to Mr. Ed Layton of Texas Title & Abstract Company of Dallas directing the preparation of a note in the amount of $200,000 to be executed by Buckingham Management Corporation and payable to Southwest Savings Association. The instruction letter directed that Cliff Cassidy, Jr. and eleven others sign the note on the back indicating personal liability to the amount set opposite each name. On November 25, 1960 Ed Drake had prepared a guaranty agreement, a draft of which was submitted to Southwest Savings Association in connection with the application for the loan, and such agreement was circulated among the various individuals listed there-

on. The first paragraph of said guaranty agreement provided that:

"For valuable consideration and to induce you to loan money and extend credit in reliance hereon, we, the undersigned, guarantee in the amounts indicated, unconditionally, the payment, when due, of that certain promissory note in the principal amount of $200,000.00, dated the 29th day of November, 1960, repayable in ten (10) equal semi-annual installments plus interest, executed by Buckingham Management Corporation."

The third paragraph of the agreement provides:

"This guaranty shall extend to and cover every extension or renewal of, and every obligation accepted in substitution for, any obligation guaranteed hereby, and we shall be bound hereby irrespective of the existence, value or condition of any collateral security you may at any time hold in the amounts and to the extent indicated after our respective names."

The note recited in the guaranty agreement was never executed by Buckingham Management Corporation. Mr. Ed Layton, acting on behalf of Texas Title & Abstract Company, examined the record title to the land to be given as security in connection with the loan and rendered a title opinion on or about November 26, 1960. At some time between November 26 and December 1, 1960 Mr. Layton called Mr. Alan Lundahl, Vice-President of Southwest Savings Association and advised him that Buckingham Management Corporation did not have record title to the security to be given in connection with the loan, and advised Lundahl that it would be necessary to change the terms of the loan, and properly identify the borrower. Layton also gave this information to Ed Drake. Layton suggested that the note be executed by H. Leslie Hill and Billy A. Dunagan, agents for Buckingham Joint Venture, the legal entity which held record title to the land to be given as

security. At the time Layton made this suggestion concerning change in the name of the borrower, Southwest Savings Association had in its possession a draft of the guaranty agreement and such agreement was then being circulated among the proposed guarantors. There is no evidence in the record that the various guarantors were advised of the change in the loan transaction prior to their execution of the guaranty agreement.

Mr. Layton was authorized by Southwest Savings Association and by Ed Drake, attorney for the Buckingham entities, to change the transaction so that the note and deed of trust would be executed by H. Leslie Hill and Billy A. Dunagan, agents for Buckingham Joint Venture project. On December 1, 1960 the closing of the loan was held in the offices of Texas Title & Abstract Company. Present at that time were Billy A. Dunagan, H. Leslie Hill, Ed Drake and Ed Layton. The note was then and there signed by Hill and Dunagan, as agents of the joint venture, as was the deed of trust. The guaranty agreement was not made a part of the papers at the closing session. Southwest Savings Association, upon receipt of the note and deed of trust executed by Hill and Dunagan, agents, placed $200,000 in escrow with Texas Title & Abstract Company to be paid out periodically as construction continued on the country club building.

One of the requirements of the title company was that the title company be furnished with a "showing as to the authorities and powers of H. Leslie Hill and Billy A. Dunagan as agents to sell, encumber or otherwise deal with captioned property * * *." A ratification agreement, dated December 5, 1960, was circulated among the members of the joint venture, ratifying the power of Hill and Dunagan to act on behalf of the joint venture in making the loan but expressly providing that the agents were empowered to execute the various security instruments binding the assets of the joint venture only, and not the joint venturers personally.

The record is silent as to when the various guarantors signed the guaranty agreement but when it was signed the same was forwarded directly to Southwest Savings Association.

Over a period of time the $200,000 placed in escrow with Texas Title & Abstract Company was paid out in connection with the construction of the country club facilities. Ultimately, the Buckingham Country Club went bankrupt and the Buckingham Joint Venture project defaulted in its obligation under the note in the amount of $200,000. After default, Southwest Savings Association foreclosed its deed of trust on the real property and bought the same for $40,000 at trustee's sale, crediting the note therewith.

## PLEADINGS

Southwest Savings Association brought this action naming C. W. Cassidy, Jr., J. J. Freiberger, DeWitt Ray, Jr., Billy A. Dunagan, Jack E. Huffhines, C. C. Huffhines, Emory L. Huffhines, J. W. Campbell, Jr., Arthur White, Walter Hailey, Jr., James Vouras, Sr. and Pete J. Vouras, as defendants. Defendants DeWitt Ray, Jr. and Walter Hailey were dismissed at the request of plaintiff. Plaintiff sought judgment against the defendants for the amounts guaranteed by each one in the guaranty agreement dated November 28, 1960, and alleged alternatively that if the court should hold that the guaranty agreement did not properly apply to the note sued upon, the guaranty agreement should be reformed, based upon alleged mutual mistake, to properly cover the note executed by H. Leslie Hill and Billy A. Dunagan, Agents. The defendants answered with a general denial, and various special defenses including express denial that the guaranty agreement had any application to the note executed by Hill and Dunagan as agents; that the guaranty agreement was conditionally delivered; that the condition giving the guaranty agreement efficacy never occurred; a plea of the statute of frauds; a plea of estoppel; assertions of the parol evidence

**766**

rule; a plea of ratification; and an express denial of any mutual mistake in the execution of the guaranty agreement.

## OPINION

The question to be decided here is the liability *vel non* of the appellees on the guaranty agreement executed by them to appellant. Appellant concedes that the obligation originally guaranteed the payment of a note to be executed by Buckingham Management Corporation and also does not seek to evade the fact that such note was never, in fact, executed by Buckingham Management Corporation. It seeks to avoid the effect of these admitted facts by contending, in its first seven points of error, that (1) the undisputed record discloses that the new note executed by Buckingham Joint Venture was accepted by appellant in substitution of the note described in the guaranty agreement; (2) that parol evidence of surrounding circumstances would be admissible to identify the subject matter of the guaranty agreement, namely, an obligation accepted by appellant in substitution of the note described in the agreement; (4) the provision of the guaranty agreement relating to "substitution" of obligations is such as to create an ambiguity and therefore parol evidence is admissible to explain same; (5) the record presents sufficient evidence to raise a fact issue as to the intention of the parties to substitute obligations within the meaning of the written guaranty agreement; and (7) that appellees are estopped to deny the effectiveness of the applicability of the new note because of their failure to repudiate the guaranty agreement prior to disbursement of the loan funds by appellant. Additionally, it contends that the court should have sustained its motion for summary judgment because (3) the undisputed record shows that the new note was accepted by appellant in "substitution" of the note originally described in the guaranty agreement so that the new note would be covered by such agreement; and (6) if not, and if there was any doubt existing as to the effectiveness of the guaranty agreement in its application to the new note, appellees are estopped, as a matter of law, to deny the effectiveness of the agreement because of their failure to repudiate the guaranty agreement.

We have carefully reviewed the entire record in the light of the rule relating to judicial review of summary judgments announced by the Supreme Court in Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, and find no merit to any of the contentions advanced by appellant and they are accordingly overruled.

A guaranty obligation is, by its very terms, a secondary obligation dependent upon the existence of a principal obligation. The term "guaranty" has been defined in numerous ways but in law it is applied to a promise of one person to perform an act of the same kind as another is contractually bound to the promisee to perform, or a promise to pay compensation for the other's nonperformance, the promise being conditioned on the latter's nonfulfillment of his duty. 27 Tex.Jur.2d, § 1, p. 279.

 In considering the construction to be placed upon guaranty agreements our courts have universally declared that a guarantor is a "favorite of the law—that, like a surety, his obligation does not extend beyond what is nominated in the bond." 27 Tex.Jur.2d, § 39, p. 306; Jarecki Mfg. Co. v. Hinds, Tex.Civ.App., 295 S.W. 274. The rule of *strictissimi juris* is to be applied in dealing with guaranty contracts. City State Bank & Trust Co. of McAllen v. United Paperboard Co., Tex.Civ.App., 146 S.W.2d 832; Jarecki Mfg. Co. v. Hinds, supra; North Texas Nat'l Bank v. Thompson, Tex.Civ.App., 23 S.W.2d 494, affirmed Tex. Com.App., 37 S.W.2d 735. Thus a guarantor's obligation is limited to his undertaking and is not to be extended by construction beyond the terms thereof. There is no implied liability on the part of the guarantor and to charge the guarantor beyond the terms of his agreement, or permitting it to be altered without his consent, would not enforce the contract made by him, but

would, in effect, make another for him. Schuab v. E. P. Dodge Mfg. Co., Tex.Civ. App., 56 S.W. 126; Smith v. First Nat'l Bank, Tex.Civ.App., 146 S.W.2d 270; Straus-Frank Co. v. Hughes, 138 Tex. 50, 156 S.W.2d 519.

■ The cardinal rule to be observed in the construction of guaranty contracts, like those of other contracts, is to ascertain and give effect, whenever possible, to the real intention of the parties. This intention is to be discovered primarily by reference to the words used in the contract. 27 Tex.Jur. 2d, § 40, p. 307. If the contract is clear in demonstrating the intention of the parties, the settled rule requires the court to give effect to that intention and the court is not permitted to look to the subject matter and the attending circumstances in order to give it a different construction. Lemp v. Armengol, 86 Tex. 690, 26 S.W. 941; Jarecki Mfg. Co. v. Hinds, Tex.Civ.App., 295 S.W. 274. However, if the meaning of the language is not plain, the attending circumstances may be considered by the court. Friedman-Shelby Shoe Co. v. Davidson, Tex.Civ. App., 189 S.W. 1029, err. ref.

■ Where uncertainty exists as to the meaning of a contract, rendering it susceptible to two interpretations, the one favorable to the guarantor, the other unfavorable, the interpretation will be given which favors the guarantor. City State Bank & Trust Co. of McAllen v. United Paperboard Co., Tex. Civ.App., 146 S.W.2d 832.

■ With these beacon lights of the law to guide our way we find no difficulty in determining the true intent of the parties as revealed by the clear and express language of the guaranty agreement. The agreement is not ambiguous. It is couched in clear and express language, easily understood by the average layman accustomed to contemporary language. A similar guaranty agreement, couched in almost identical terms, was considered by the New Jersey Superior Court, Appellate Division, in Garfield Trust Co. v. Teichmann et al., 24 N.J. Super. 519, 95 A.2d 18. The precise question was there presented to the court relating to an agreement wherein the guarantors were to be responsible only for loans and credit extended directly to Paramount Finishing Company, Inc. Instead, the executed notes were payable to a corporation known as Roco-Tex Chemicals, Inc. Liability on these obligations against endorsers was denied by the court which said, *inter alia*:

"We find no ambiguity or uncertainty in the language employed in the agreement. The intent and meaning of the contract is crystal clear, and under a reasonable construction thereof no liability was imposed upon the guarantors except for loans or credit extended directly to Paramount."

■ The contract being unambiguous the application of the parol evidence rule becomes inapplicable. However, appellants argue that even so they were entitled to present parol evidence in order to identify the subject matter of the guaranty agreement as it related to a substitution of obligations. We cannot agree with this contention nor any of the contentions advanced by appellant concerning substitution of obligations. The record is undisputed that the original obligation to be guaranteed by the guarantors never came into existence. Inherent in the word "substitute" is the existence of another thing to be replaced. Since there was never a primary obligation created it logically follows that there can be no substitution.

■ Appellant's contention that appellees are estopped to deny their liability on the note executed by Buckingham Joint Venture is predicated upon the contention that appellees failed to come forward and deny their liability on the guaranty agreement prior to the disbursement of the funds advanced by appellant. In the recent case of Alco Oil & Gas Corp. v. Concord Oil Co., Tex.Civ.App., 375 S.W.2d 463, the court set forth the necessary ele-

ments of estoppel as being (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) to a party without knowledge, or means of knowledge, of those facts; (4) with the intention that it should be acted upon; and (5) the party to whom it was made must have relied or acted upon it to his prejudice. A reading of this record demonstrates the absence of at least two of these elements of estoppel. Appellant has shown no evidence which reveals any misrepresentation or concealment of material fact on the part of appellees. There is no evidence that appellees were under any duty to come forward and advise appellant that they did not intend to be bound by the terms of the guaranty agreement. Appellant was possessed of all of the facts surrounding the making of the new note to take the place of the one originally agreed to be guaranteed by appellees. Secondly, it cannot be said that appellant was without knowledge, or means of knowledge, of any of the facts. Appellant had in its possession a copy of the guaranty agreement at the time of the closing of the loan in question. This agreement revealed to appellant that appellees had contracted to assume the obligation of paying a note to be executed by Buckingham Management Corporation, not Buckingham Joint Venture. Appellant did not call for or demand the execution of another guaranty agreement prior to closing of the loan. Appellant did not call upon appellees to execute a ratification agreement confirming the substitution of the note of Buckingham Joint Venture for that of Buckingham Management Corporation. To the contrary, appellant merely called upon some of appellees who were members of the joint venture to ratify the acts of their agents in executing the new note. In the light of these facts the doctrine of estoppel is not available to appellant.

By its last three points on appeal appellant contends that the trial court should have sustained its motion for summary judgment or was in error in sustaining appellees' motion for summary judgment, because appellant was entitled to a reformation of the guaranty agreement on the grounds of mutual mistake. Appellant contends that the undisputed evidence establishes a mutual mistake of the parties with reference to the substitution of the notes in question, or, failing that, an issue of fact was created as to the issue of mutual mistake which would lead to reformation of the agreement. We find no merit in these points and overrule them.

An action brought to reform an instrument based upon mutual mistake is a suit in equity to enforce an equitable right to have a mistake corrected. If the instrument in question expresses clearly the intention of the parties at the time that the agreement is reduced to writing, then there is no occasion to reform it. However, if the agreement which has been reduced to writing contains an error, arising out of mutual mistakes, so that it does not truly represent the understanding of both the parties at the time of execution, equity may, indeed, reform it. But in this instance the court is without power to do more than that; it may not make a new contract for the parties, nor may it insert terms into the instrument which are beyond the original agreement and undertaking of the parties. Continental Southland Savings & Loan Ass'n v. Bunyard, Tex.Civ. App., 109 S.W.2d 276; Long v. Humble Oil & Refining Co., Tex.Civ.App., 154 S.W.2d 925; Continental Casualty Co. v. Bock, Tex.Civ.App., 340 S.W.2d 527; Home Ins. Co., New York v. Privitt, Tex.Civ.App., 120 S.W.2d 294; Connor v. Brown, Tex. Civ.App., 226 S.W.2d 229.

When the record is examined in the light of these authorities it is obvious that there was no mutual mistake and therefore there can be no reformation on that basis.

While the facts of this case are somewhat complicated the basic problem presented yields to a simple solution. Ap-

pellees bound themselves as guarantors on a definite undertaking of Buckingham Management Corporation. This undertaking never came into existence. Another and different obligation was accepted by appellant. Therefore, the original guaranty agreement was not complied with and the obligation of the guarantors was thereby discharged.

Finding no reversible error reflected in this record the judgment of the trial court is affirmed.

Affirmed.