**SPIN–LINE COMPANY, Inc., et al.,**
**Appellants,**

v.

**UNITED CONCRETE PIPE CORPORA-**
**TION, Appellee.**

**No. 16972.**

Court of Civil Appeals of Texas.
Dallas.

Oct. 27, 1967.

Rehearing Denied Nov. 24, 1967.

David M. Kendall, Jr., Woodruff, Hill, Bader & Kendall, Dallas, for appellants.

Benjamin Raye Collier, Stigall & Maxfield, Dallas, for appellee.

CLAUDE WILLIAMS, Justice.

The paramount question presented by this appeal is the liability *vel non* of the corporate and individual appellants on a non-negotiable promissory note executed by the corporation, with the individuals being endorsers thereon, said note being subject to the terms and conditions of a contemporaneously executed written contract.

## FACTS

In 1963 Shell Pipe Line Corporation (hereinafter referred to as Shell) was awarded a contract to build and install a pipe line to furnish water to oil producers in the Permian Basin area in West Texas. Shell did not have the necessary concrete pipe to perform the contract so, during the latter part of 1963, such company invited competitive bids in order to obtain the pipe, it being understood that the bids to be submitted were on a "unit price" basis. Shell did not know at that time, and had no way of ascertaining, exactly the amount of pipe which would be required to complete the contract and such was the basic reason for the "unit price" bid. Among the various bidders were Spin-Line Company, Inc. (hereinafter referred to as Spin-Line) and United Concrete Pipe Corporation (hereinafter referred to as United). Spin-Line proved to be the low bidder and was awarded the contract which was designated the "El Capitan (West Texas) Water System." A written contract was executed by Spin-Line and Shell, same containing an exhibit setting forth in detail the respective unit prices of the pipe involved. Due to some question concerning Spin-Line's financial ability to perform, Shell required an indemnity agreement to be executed by eight individual Spin-Line stockholders (said parties owning practically all of Spin-Line's capital stock) to secure Spin-Line's performance. Separate agreements of indemnity, with a maximum of $300,000 liability, were executed in favor of Shell by each of the eight individuals.

S. Mort Zimmerman, president of Capital Exchange Corporation (which company votes 100 per cent of Spin-Line's stock) and also a director of Spin-Line, was active in behalf of Spin-Line and the individual indemnitors during the early stages and final consummation of the El Capitan contract with Shell. Each of the individuals admitted that they had been involved with Zimmerman on a number of occasions and business ventures and that each had received the indemnifying agreement from

Zimmerman, signed the same and returned it to him.

Within a short time it became apparent that Spin-Line was unable to perform the El Capitan contract, the reason for such failure to perform being, inter alia, lack of proper facilities to manufacture the concrete pipe.

Mr. Galbraith, an official of Shell, testified that Zimmerman came to the Shell office in Houston and "said that they could not perform and wanted to know what we would like to do about it * * *." Zimmerman was informed that Shell was going to hold Spin-Line strictly to its contract. Zimmerman then advised the Shell officials that he thought that a deal could be worked out with United to furnish the pipe so that Shell would not be in default. With that he left the Shell office with the promise to communicate back and let them know what sort of a deal he might make with United. United had submitted the second lowest bid on the El Capitan job.

About the first week in December 1963 Zimmerman called Mr. Curtis, president of United, whose offices were in California, in which he stated that he would like to come out to California and talk over the Shell contract. Zimmerman went to California and in a conversation with Curtis advised him that "they" were in trouble and would not be able to complete the Shell contract. He advised Curtis that he would like to explore the possibility of United taking over Spin-Line's contract. Curtis told Zimmerman he would investigate and "give him a price at which he would agree to accept the transfer of the contract." Curtis did in fact send representatives to Texas who discussed the matter with Shell and based upon the information obtained Curtis determined that for a figure of "about $214,000" United would be willing to take over the Shell project. In the meantime, Zimmerman wrote a letter, dated December 14, 1963, to Mr. Curtis confirming the visit to California and other telephone conversations relating to the Shell

contract. In this letter Zimmerman outlined their verbal understanding which included an understanding that as a part of the consideration for the transfer of the contract and indemnification by Spin-Line, United was to agree to cause the completion of Spin-Line's concrete plant at Odessa, Texas in order that Spin-Line might establish a basis for offering such complete plant facilities for sale "to any potential purchaser located outside the continental limits of the United States of America."

After several discussions between Curtis and Zimmerman on the telephone a "Memorandum of Understanding" was reduced to writing, dated December 10, 1963, and executed by Zimmerman on behalf of Capital Exchange Corporation and Spin-Line and by Curtis on behalf of United. By the terms of this "Memorandum of Understanding" Capital Exchange Corporation and Spin-Line agreed to cause Shell to substitute United as contractor under the original contract between Shell and Spin-Line. In consideration therefor Spin-Line agreed to pay United the sum of $214,350, such sum to be evidenced by a promissory note payable on or before July 1, 1964 "to be executed by Spin-Line and all of the persons who have individually entered into the Indemnity Agreement provided by Shell as required in the aforesaid contract dated November 22, 1963." The agreement further provided that "It is the intent of Spin-Line to dispose of its concrete pipe fabricating facilities located at Odessa, Texas for use in a foreign country. In the event sale is consummated, United will assist Spin-Line in such sale by furnishing personnel at a reasonable cost to complete the facilities and place the same in operating condition. * * * United will allow the free use of its patent rights and processes. * * *"

After the "Memorandum of Understanding" was returned to Zimmerman in Dallas, Zimmerman requested that Mr. Young, vice-president of United, and Mr. Bergemann, house attorney for United, come to Dallas to work out a definite agreement in

the form of a contract that would be satisfactory to the parties.

Bergemann testified that he and Mr. Young met Zimmerman in Dallas in the early part of January 1964. He said that he was "sent to Dallas by United to enter into negotiations with Zimmerman looking to the consummation of an agreement whereby United would take over the Shell contract with Spin-Line and they would be compensated for taking it over." He said that he had been instructed to get approximately $200,000 as the monetary portion of the consideration for the takeover agreement and that such amount could be evidenced by a note. He conferred with Zimmerman and Mr. Marsh (Capital Exchange's lawyer) for about two days working out the details of the contract. In connection with the promissory note it was necessary to get same endorsed by the indemnitors who had agreed to indemnify the Shell contract and since these indemnitors were scattered all around the country he suggested to Zimmerman that he call these people and tell them to send a telegram agreeing to endorse the note. Zimmerman proceeded to call each of the various indemnitors and explained to them that United had agreed to take over the Spin-Line-Shell contract at a price and that it would be necessary for them to endorse a note. He requested that each of them send him a telegram assenting to this. According to Bergemann all of the telegrams were received by Zimmerman while he was there.

The promissory note was dated January 10, 1964 and is here copied:

"PROMISSORY NOTE

"DALLAS, TEXAS
"JANUARY 10, 1964

"Upon presentment on July 31, 1964 at the offices of the undersigned corporation in Odessa, Texas, the undersigned promises to pay to United Concrete Pipe Corporation, the sum of One Hundred Ninety-Eight Thousand Eight Hundred Fifty Dollars and no/100 Dollars ($198,-850.00), without interest.

"Past due principal shall bear interest at the rate of six percent (6%) per annum. If this note is placed in the hands of an attorney for collection, or if it is collected through judicial proceedings, an additional ten percent (10%) on the full amount shall be paid for attorney's fees.

"This note is subject to the terms and conditions of that certain Agreement between the undersigned corporation and United Concrete Pipe Corporation of even date. This note is non-negotiable.

"SPIN-LINE COMPANY, INC.
"By
    "/s/ Lloyd R. French
                    "President

"The undersigned without presentment or protest hereby each endorse the above note to the extent of twelve and one-half percent (12½%) of all amounts due thereunder."

(Followed by the names and addresses of the individual endorsers.)

The material portions of the agreement which was then prepared are as follows:

"AGREEMENT

"THIS AGREEMENT, entered into and effective the _____ day of January, 1964 between SPIN-LINE COMPANY, INC., a Texas corporation (hereinafter called 'Spin-Line') and UNITED CONCRETE PIPE CORPORATION, a California corporation (hereinafter called 'UNITED'):

"WITNESSETH;

"WHEREAS, Spin-Line has heretofore entered into a contract dated November 22, 1963 with Shell Pipe Line Company (hereinafter called 'Shell'), said contract being entitled 'Contract for Purchase of Materials and Services for EL CAPITAN (West Texas Water System)'; and

"WHEREAS, the parties hereto are in mutual agreement that United should be substituted for Spin-Line in aforesaid agreement; and

"WHEREAS, Spin-Line desires to obtain the assistance of United in completing its concrete pipe fabricating facilities located at Odessa, Texas, primarily for the purpose of selling the same for use in a foreign country; and

"WHEREAS, it is deemed in the best interest of United to cause the completion of these facilities in order that they shall be sold out of the United States;

"NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto do mutually agree as follows:

"1.

"Spin-Line will cause Shell to enter into a contract with United covering the same work as specified in aforesaid contract dated November 22, 1963 and thereafter to release Spin-Line from all obligation and responsibility under said contract.

"2.

"In addition to all sums to be paid by Shell under aforesaid contract, Spin-Line agrees to pay to United the sum of $198,-850.00 for the performance of the contract to be entered into between Shell and United, subject to a further reduction of $8,500.00 in the event the lining of the steel pipes can be done with sand substituted for pozzolan. The sum which Spin-Line shall be hereby required to pay to United shall be represented by a promissory note payable on or before July 31, 1964. Said note shall be endorsed by certain individuals as reflected on the note attached hereto and incorporated herein. In the event the sale of Spin-Line's concrete pipe fabricating facilities is consummated prior to July 31, 1964, the first proceeds from the same shall be applied to the payment of said note.

"3.

"In the event that Shell agrees to increase the contract price of the new contract with United to an amount in excess of the contract price to Spin-Line, the amount which Spin-Line shall be obligated to pay to United pursuant to the provisions of Paragraph 2 above shall be reduced by the amount of such increase in contract price, and aforesaid promissory note shall be modified accordingly.

"4.

"In connection with the proposed sale and disposition of Spin-Line's concrete pipe fabricating facilities located at Odessa, Texas, United agrees as follows:

"(a) United will demonstrate similar facilities in operation at one of its plants to any prospective purchaser when requested by Spin-Line, such demonstration to include operations of the prestressed concrete pipe plant, steel processing equipment, curing operations and in general the demonstration of the full capability of a concrete pipe manufacturing plant similar to the facilities of Spin-Line when completed.

"(b) Upon the consummation of a sale outside of the United States, United will grant to said purchaser a royalty-free use of the pertinent United patent rights and processes. *United requires under the terms of this contract that Spin-Line sell these facilities outside the United States.*

"(c) Upon the request of Spin-Line (which request will not be made until a sale has been consummated or there are reasonable grounds for believing that a sale to a specified customer will be consummated), United will furnish personnel at a reasonable cost to complete Spin-Line's concrete pipe fabricating facilities and place the same in operating condition.

Any sums expended by United under the provisions of this subparagraph shall be expended with the prior approval of Spin-Line.

"(d) United will establish the capacity of performance of said concrete pipe fabricating facilities which in general will be at least sufficient to produce the quantity and quality of concrete pipe used in connection with the Shell contract referred to above. United will prepare and deliver written performance specifications which are in conformity with industry standards and will warrant in writing such performance specifications to any purchaser of these facilities."

In the meantime Shell was advised by Mr. Young of United that United had entered into an agreement with Spin-Line whereby United would supply the necessary pipe and complete the Shell contract. Thereupon Shell entered into a purchase order agreement with United which contained the exact unit prices as contained in the original Shell-Spin-Line contract. Thereupon Shell proceeded to release both Spin-Line and the individual indemnitors from all liability flowing from the original Shell-Spin-Line contract.

Bergemann took the contract, copied above, which had been signed by French as President of Spin-Line, back to California where it was inspected by Mr. Curtis. Mr. Curtis testified that he found language in the instrument that was different from that which had previously been agreed to with Zimmerman. He stated that there had never been an agreement to the effect that United would require Spin-Line to sell its facilities only outside the United States. He therefore had the first three or four pages of the agreement retyped and the following changes made:

In the preamble of the agreement the sentence reading:

"WHEREAS, it is deemed in the best interest of United to cause the completion of these facilities in order that they shall be sold out of the United States;"

was changed to read:

"WHEREAS, United desires to assist Spin-Line in the sale of its facilities."

Paragraph 3 was changed so that in three instances therein the words "contract price" were changed to read "unit price."

In Paragraph 4(b) of the agreement the following sentence was omitted: "United requires under the terms of this contract that Spin-Line sell these facilities outside the United States."

Having made these changes the retyped pages were inserted in the original instrument over the signature of Mr. French on behalf of Spin-Line, and then the instrument, as changed, was signed by Mr. Bergemann as Secretary of United. There is no evidence that anyone on behalf of Spin-Line executed the instrument again following the changes made in California.

Curtis testified that after the contract had been thus changed and signed by Bergemann it was "sent" back to Zimmerman.

By letter dated January 27, 1964 Bergemann wrote to Zimmerman and said, inter alia:

"We are also enclosing copies of the Agreement between Spin-Line Company, Inc. and United Concrete Pipe Corporation with respect to the concrete pipe fabricating facilities belonging to Spin-Line located in Dallas. We have taken the liberty to make a technical change in the agreement to eliminate any limitation with respect to the geographical disposition of the equipment. These changes do not affect the intent of the parties in any manner and we trust you will find them in order."

When this letter was offered in evidence appellants' attorney stated and stipulated in open court as follows:

"I am willing to stipulate that the letter was sent on January 27, 1964; was sent

with the final draft back to Mr. Zimmerman. The letter itself contains conclusions of the writer, self-serving declarations. * * * Whatever it is properly admissible for would show a lettter was written on that date and sent with the final draft, I will also stipulate."

The individual appellants, in answer to interrogatories, all testified:

"Q. Was a promissory note in the principal amount of $198,850, dated on January the 10th, 1964, signed by the President of Spin-Line in his behalf forwarded to you for your limited endorsement; if so, please state when and what amount and by whom such a note was forwarded to you.

"A. Yes, we don't recall the details or how or when.

"Q. Did you endorse same and if so, please state when such note was returned.

"A. Yes, we returned it to Capital Exchange Corporation.

"Q. Were you aware that an agreement of even date with said note was entered into by and between United and Spin-Line?

"A. Yes.

"Q. Were you advised of the terms and conditions of said agreement, were such terms and conditions acceptable to you?

"A. We were advised and agreed generally to the terms. We understand that United may have unilaterally changed some of the terms."

It is undisputed that no response was received from Zimmerman to the letter of transmittal referred to above nor is there any evidence that either of the endorsers, other than Zimmerman, received actual notice of the changes made in the contract as above related.

United proceeded to fulfill its obligation to Shell and completed the contract with that company with apparent satisfaction to all parties concerned. There is testimony that on at least two occasions United, at the request of Spin-Line, demonstrated similar facilities of Spin-Line to prospective purchasers of the Spin-Line facilities but no sale was made either in or out of the United States. After the Shell contract had been completed and the note became due it was presented to Spin-Line and payment refused. Each of the individual endorsers refused to make payments. Thereafter this action was instituted by United against Spin-Line and the individual endorsers seeking judgment for the amount of the note, interest and costs. Spin-Line and the individual defendants countered with numerous special defenses including denial of contract. Spin-Line also, in the alternative, asserted a cross-action against United based upon alleged breach of the contract. United, in response to special defenses pled, asserted the doctrine of estoppel, ratification and acquiescence. It was also asserted that Zimmerman was the actual or apparent agent for Spin-Line and the individual endorsers and that his acts and conduct ratified the agreement and that the defendants were estopped to deny such agency and authority thereof. United admitted in its pleadings that certain language in the original agreement had been changed by United but alleged that such changes were immaterial and that the contract, as changed, was accepted by Zimmerman as agent for Spin-Line and the individuals concerned.

The case was tried to the court and jury and in response to special issues submitted the jury made the following material findings: (1) that the changes in the draft of the contract did not amount to material changes; (2) that the draft of the contract prepared by United was more favorable to Spin-Line and the endorsers than the draft of contract originally signed by Spin-Line; (3) that the draft of the contract, as changed by United, was accepted by Zimmerman for himself and on behalf of Spin-Line and the individual endorsers;

(4) that Zimmerman had authority to accept such changed draft of contract on behalf of Spin-Line; (6–18) that Zimmerman had authority to accept such changed draft of contract on behalf of each of the individual endorsers; (20) that Zimmerman had apparent authority to act on behalf of Spin-Line and each of the individual endorsers on the promissory note in accepting the changed draft of the proposed contract; (21) that United fully performed all of the terms and obligations which the changed contract purported to require of it, and (22) such performance by United was done in reliance upon the apparent authority of Zimmerman to accept the changed draft of the contract.

After overruling motions for instructed verdict, motions for judgments *non obstante veredicto,* and motions for new trial, the trial court rendered judgment in favor of United and against Spin-Line for the sum of $248,738.15, representing principal balance and interest on the promissory note sued upon, together with $22,612.56 attorneys' fees, and against each of the named individual endorsers in the sum of $31,092.-27, plus 12½ per cent of all costs of court.

## OPINION

■ While it is true that the basic cause of action brought by appellee was upon a simple non-negotiable promissory note, it is equally true that the validity of the judgment rendered against the maker and endorsers of such note is dependent upon the validity of the contract referred to in the note. Appellants make no contention concerning the note itself or the execution thereof but assail the judgment primarily on the proposition that the contract between United and Spin-Line was never brought into being and therefore no liability attached to either Spin-Line or the individual endorsers by reason of the execution of such note. Implementing a myriad of legal principles in the field of contract, agency and suretyship law, appellants mount an attack upon the judgment in a plethora of

points, fifty-eight in number, many involving purely procedural questions. It is evident that appellants' main assault is founded upon the premise that since United made a material change or changes in the original draft of the contract signed by Spin-Line such changes resulted in no agreement at all between the parties. Also they assert that since the material alterations or changes in the agreement were made without the knowledge or consent, express or implied, of the endorsers of the note, they were thereby released of their legal obligation, as a matter of law.

By countervailing points appellee contends that the jury verdict resolving the questions of materiality of the contract changes, the matter of agency, estoppel, ratification, etc., is amply supported by the record and therefore the judgment was correct.

■ We first consider the question of alteration of the instrument. Were the admitted changes and alterations immaterial, as contended by United, or material, as asserted by appellants? If they were material the law is well settled in Texas, as elsewhere, that such material alteration renders the instrument void and unenforceable by the party who made the alteration as to the nonconsenting parties. 3 Tex.Jur.2d, § 3, pp. 36–37; 4 Am.Jur.2d, § 9, p. 10; 3 C.J.S. Alteration of Instruments § 5, p. 907. It is also the general rule that whether the altered and changed contract is more favorable or beneficial to the party sought to be charged thereon is not material or pertinent in deciding the question of the validity of the contract. 3 Tex.Jur.2d, § 10, p. 44; 4 Am.Jur.2d, § 8, p. 10.

■ The law broadly defines materiality of alteration to be any change that causes an instrument to speak differently in legal effect from what it originally spoke. The true test seems to be whether the altered writing describes the contract entered into by the parties, or whether the instrument's legal effect has been varied. 3 Tex.Jur.2d,

§ 4, pp. 38–39. In 4 Am.Jur.2d, § 5, pp. 6–7, it is said:

"Generally speaking, any alteration of an instrument is material which destroys the identity of the instrument or of the contract evidenced thereby, or which so changes its terms as to give it a different legal effect from that which it originally had, and thus works some change in the rights, obligations, interest, or relations of the parties."

In Starks v. Loftus, 248 S.W. 1090 (Tex. Civ.App., Galveston 1923), the court stated the rule that an alteration is material if it changes the legal effect of the instrument, either in its terms or the relation of the parties thereto. The court cited the reasoning for this rule as set forth in the early opinion of the Supreme Court of Texas in Miller v. Alexander, 13 Tex. 497 (1855), as follows:

"If, on the production of such an instrument, it appears to have been altered, it is incumbent on the party offering it in evidence to explain this appearance. For the instrument is supposed to have been intended to express the agreement of the parties, solemnly adopted as such, and attested by the signature of the party engaging to perform it. Any alteration, therefore, which makes it speak a language different in effect from that which it originally spoke, destroys its identity, and its legal virtue, for it is no longer the agreement which the parties undertook to perform. An agreement to be binding must have the assent of both the contracting parties; and, consequently, cannot have legal validity if altered by one party without the concurrence of the other. Hence, every alteration on the face of the instrument which evidences the agreement renders it suspicious; and this suspicion the party claiming under it, is ordinarily held bound to remove."

In the more recent case of Associated Sawmills, Inc. v. Peterson et al., 366 S.W.2d 844 (Tex.Civ.App., Dallas 1963), we applied this well reasoned rule.

■ The question of whether the alteration was material within the meaning of the established rule of law thus announced is one of law and not one of fact to be decided by a jury. Park v. Glover's Heirs, 23 Tex. 469 (1859); People's Finance Co. of Dallas v. Sabanovich, 26 S.W.2d 187 (Tex.Com. App.1930); 3 Tex.Jur.2d, § 49, p. 76; 4 Am.Jur.2d, § 90, p. 84.

■ In attempting to resolve the question of law thus presented we must, of necessity, apply the general rules of construction of contracts and the first of such rules is to ascertain and give effect to the real intention of the parties as that intention was revealed by the language used in the agreement. It is also appropriate and proper to consider the negotiations of the parties leading up to the written agreement and to view the agreement as of the time it was made and not in the light of subsequent events. Ervay, Inc. v. Wood, 373 S.W.2d 380 (Tex.Civ.App., Dallas 1963, writ ref'd n. r. e.); Fleming Oil Co. v. Anco Gas Corp., 217 S.W.2d 29 (Tex.Civ.App., El Paso 1948); 13 Tex.Jur.2d, § 122, pp. 287–288.

Applying these established principles of law to the record in this case we have reached the conclusion and so hold that the contract was altered in two respects, one being immaterial and the other material.

■ The change of the words "contract price" to "unit price" in Paragraph 3 of the original contract is quite obviously an immaterial change which does not affect the status of the parties nor the obligation of anyone. This fact becomes quite obvious when it is observed that all parties intended that United was to be substituted for Spin-Line in the original Spin-Line-Shell contract on the same terms and conditions as therein set forth. The record is without dispute that the Shell contract with Spin-Line was made on a "unit price" basis and

for very good reason. Shell requested bids on a "unit price" basis and secured such a bid from Spin-Line which eventually was made into a contract. Under these circumstances there could be no "contract price" as generally understood. All through the negotiations between Spin-Line and United leading up to the taking over by United of the Shell contract the parties referred to "unit price" except in one instance and that was in the "Memorandum of Understanding" wherein the term "contract price" was mentioned. The contract eventually made by United with Shell was on a "unit price" basis and was the same as that previously made by Spin-Line. Based solely upon the peculiar facts before us we think it obvious and so hold that the use of the terms "unit price" and "contract price" were synonymous. As a matter of fact, the entire statement of facts is devoid of any testimony concerning this change made in the contract, or the effect thereof. Being immaterial, this particular change does not affect the validity of the contract.

However, based upon a very careful review of the record we are of the opinion and so hold that the changes made by Curtis, president of United, having to do with the restriction upon the sale of the Spin-Line facilities outside the continental limits of the United States do constitute a material change and alteration of the contract so as to affect the obligation of the parties thereon. While it is argued that the change made by United would be more profitable and favorable to Spin-Line such fact, if it is a fact, has no material bearing upon the question to be resolved. The fact remains that the contract as originally drawn up in Dallas contained a specific and mandatory provision that the sale of the Spin-Line facilities must be made outside the United States. This was an obligation on the part of all parties concerned and was mutually agreed to as reflected by prior oral and written communications between the parties. In this connection it must be borne in mind that the contract in question was one instrument but dealing with two separate subject

matters, somewhat related. The prime purpose of the contract was to effectuate the substitution of United for Spin-Line on the Shell contract. The other provisions of the contract had to do with United's acceptance of an obligation to aid Spin-Line in the completion of its facilities at Odessa so that they might be sold outside the United States. The record reveals that United owned certain patent rights involving the processes involved in the manufacture of pipe. Apparently these patent rights constituted motivating factors in the ultimate provisions of the agreement between the parties. Such patent rights would logically form the basis for United's restrictive requirement contained in the original draft of the contract that the facilities must be sold outside the United States. This restriction was obviously recognized by Spin-Line and agreed to by that corporation. Such restrictive agreement undoubtedly created certain legal obligations on the part of both parties and it cannot be logically said that the changing of these conditions did not materially affect the legal relationship between the parties.

Such material alteration and change completely negates any meeting of the minds of the parties which is so fundamentally necessary in the creation of any contract. Summers v. Mills, 21 Tex. 77 (1858); Garrett v. International Milling Co., 223 S.W. 2d 67 (Tex.Civ.App., Texarkana 1949); 10 Tex.Jur., § 23, p. 42; 17 C.J.S. Contracts § 42, p. 674.

■ This brings us to a consideration of appellee's contention that even if there was a material change in the contract the new and revised edition of the agreement amounted to a counter proposal by United and since it was forwarded to Zimmerman who was the agent of Spin-Line and the individual appellants, such agreement became a contract by Zimmerman's silence coupled with the performance of the contract by United. Thus appellee seeks to apply the doctrines of ratification and estoppel by silence. It is well settled than an

instrument will not be vitiated by an alteration therein, however material, made by one of the parties thereto, if the alteration is made with the knowledge and assent of the party or parties sought to be charged thereon. 3 Tex.Jur.2d, Alteration of Instruments, § 18, p. 51; Taylor Construction Co. v. Clynch, 196 S.W.2d 700 (Tex.Civ.App., Amarillo 1946). It is also true that a materially altered writing may be given validity by virtue of the principle of estoppel whereby a party may be estopped from denying liability on an altered instrument where he, with knowledge of the alterations, accepts the benefits according to the terms of the altered instrument. 3 Tex.Jur.2d, Alteration of Instruments, § 20, pp. 53–54. The *sine qua non* of the application of each of these principles of law is the knowledge on the part of the party or parties sought to be charged by the altered instrument.

Applying these principles of law to the record before us it is evident that by virtue of the testimony of Curtis, as well as judicial admission made by appellee's attorney in open court, the altered contract was returned to Zimmerman who would be charged with knowledge thereof. The question then arises as to whether knowledge by Zimmerman would be imputed to Spin-Line and the other individual appellants. We have carefully examined the record and find an entire absence of evidence that any of the individual appellants, other than Zimmerman, had actual knowledge of the changes made in the contract. The requests for admissions answered by the individual appellants is not sufficient to bring on such knowledge for the simple reason that their answers obviously related only to the original agreement and not to the changed or altered contract. Nor do we find any evidence to support appellee's contention that Zimmerman was clothed with apparent authority to accept the rewritten contract on behalf of the other individual appellants. The change was material and different from the original draft agreed upon by the individual appellants and there is nothing in this record to in-

dicate that the apparent authority of Zimmerman extended as far as contended by appellee. In any event, we hold that the evidence is insufficient to show such apparent authority vested in Zimmerman by the remaining individual appellants.

As to Spin-Line we need not reach the question of whether Zimmerman's knowledge of the changed contract bound such corporation for the simple reason that it filed a cross-action in this case seeking to enforce the revised contract and thereby embraced same. The rule is thus stated in 2 Tex.Jur.2d, § 95, p. 543:

"If the principal, with full knowledge of all the material facts of the case, attempts to enforce a contract made by the agent without authority, by commencing an action against the third party involved, such action by the principal is deemed to constitute a ratification of the agreement."

We therefore conclude that as to Spin-Line and appellant Zimmerman, the doctrine of estoppel and ratification is applicable and that each appellant is bound by the terms and provisions of the revised contract.

However, as to the remaining individual appellants the record is clear that they are not legally bound by the provisions of the revised contract and since the note sued upon is contingent upon such terms and conditions, such endorsers are released from liability.

In the case of Southwest Savings Ass'n v. Dunagan, 392 S.W.2d 761 (Tex.Civ.App., Dallas 1965, writ ref'd n. r. e.), we had occasion to comment extensively upon the rule of *strictissimi juris* as applicable to guaranty contracts. We think the same general rule is applicable in this case as relates to the liability of the individual endorsers, other than Zimmerman, on the note sued upon. It is clearly the law that since the surety is bound only by the precise terms of the contract, the performance of which he secures, any material alteration or change in its terms, whether in-

jurious or not, unless made with his consent, operates to discharge him. 53 Tex. Jur.2d § 36, pp. 601–602. Furthermore, a surety has a perfect right to rely upon the instrument and there is no requirement upon him to keep watch over the conduct of the parties thereto to determine whether changes have been made in the instrument. Old Colony Ins. Co. v. City of Quitman, 163 Tex. 144, 352 S.W.2d 452 (1961); Southwest Savings Ass'n v. Dunagan, 392 S.W.2d 761 (Tex.Civ.App., Dallas 1965, writ ref'd n. r. e.), and cases therein cited; Fidelity & Deposit Co. of Maryland v. Kelsay Lumber Co., 33 S.W.2d 731 (Tex.Com.App.1930); Wilson v. J. W. Crowdus Drug Co., 222 S.W. 223 (Tex.Com.App.1920); Hughes v. Straus-Frank Co., 127 S.W.2d 582 (Tex.Civ.App., San Antonio 1939, affirmed Tex.Com.App.1941, 138 Tex. 50, 156 S.W.2d 519); Stephenson v. Nelson, 243 S.W. 1069 (Tex.Com.App.1922).

The remaining points presented by appellants have to do with procedural matters. We have carefully examined same and find them to be either immaterial or reflecting no reversible error.

It is our judgment that the judgment of the trial court insofar as it relates to appellants Spin-Line Company, Inc. and S. Mort Zimmerman be and the same is affirmed. It is our further judgment that the judgment of the trial court, as relates to the appellants Frank C. Anderson, Ross Brunner, Lloyd R. French, Henry Homes, Jr., William C. Huls, Philip Leserman, III, and Albin P. Scott, be and the same is hereby reversed and rendered that appellee United Concrete Pipe Corporation do have and recover nothing from these named appellants.

As to the costs of this appeal it is ordered that 75 per cent thereof be assessed against appellee United Concrete Pipe Corporation and 25 per cent be assessed against appellants Spin-Line Company, Inc. and S. Mort Zimmerman.

Affirmed in part and reversed and rendered in part.