OCEAN MANOR LIMITED, a Florida limited partnership, Plaintiff-Appellee,

v.

Louise W. LINDLAND, Executrix, is substituted in place of Richard L. Lindland, Deceased, Defendant Third-Party Plaintiff-Appellant,

v.

KOVACS INVESTMENT GROUP, a Florida Trust, and Lauriston L. Crockett Trust, a Florida Trust, jointly and severally, Third-Party Defendants.

No. 76–1809.

United States Court of Appeals, Fifth Circuit.

Sept. 18, 1978.

Rehearing Denied Oct. 27, 1978.

W. John Gundlach, Jr., Miami, Fla., for defendant-third-party plaintiff-appellant.

John A. Thabes, Ft. Lauderdale, Fla., for plaintiff-appellee.

Before INGRAHAM, GEE and TJO-FLAT, Circuit Judges.

PER CURIAM:

This appeal presents as its sole issue the question whether actions by Ocean Manor Limited (Ltd.), the obligee on a wrap-around[1] real estate note and mortgage, were of such a nature as to discharge Richard L. Lindland, an uncompensated partial guarantor of the note, from his guaranty agreement.

Ltd. sold a hotel to Ocean Manor, Inc. (Inc.) pursuant to an agreement by which Inc. was to assume three prior mortgages, whose total unpaid balance was $3,694,221, and was to pay an additional $941,000 to Ltd. itself. The first mortgage on the hotel was to First Federal Savings & Loan of Miami, and the remaining mortgages assumed were to Coral Manor Corp. (Coral). The instrument of sale was actually two documents, a wrap-around mortgage and a wrap-around note. The amount of the note was $4,635,400, the sum of the total unpaid balance of the assumed mortgages and the $941,000 to be paid directly to Ltd. Lindland, now deceased, guaranteed that portion only of the wrap-around note providing that Ltd. would be paid directly $941,000. Payments under the note were to be $27,000 per month for the months May through October 1972, and $25,800 for each month thereafter. The $1,200 per month differential for the first six months was to reimburse Ltd. for prepaid interest, which it had advanced at the time of closing to prepay interest due Coral on the second mortgage. Lindland was an uncompensated guarantor and did not sign the wrap-around mortgage.

The wrap-around note stated that: "All payments may be applied by the holder first to repayment of moneys paid by the holder

---

1. A term indicating that the purchaser's payments were to include amounts sufficient to service the existing indebtedness as well as the new one to Ltd. resulting from the current sale.

hereof in accordance with the terms of the mortgage securing the payment of this note, and thereafter shall be applied to payment of accrued interest, and lastly to payment of principal." The note then provided that, from the monthly installments paid on the note, the noteholder shall make payments on the existing indebtedness encumbering the property described in the mortgage securing the note in the following order: (1) the monthly installments of the first mortgage to First Federal ($14,000); (2) the monthly installments on the second mortgage to Coral ($5,904); (3) the monthly installments on the third mortgage to Coral ($833); and (4) the balance of the principal amount of the note plus interest.

The wrap-around mortgage provided a somewhat different disbursement schedule: "That, in order to more fully protect the security of this mortgage, the mortgagor, together with, and in addition to, the monthly payments under the terms of the note secured hereby, on the specified payment date of each month until the said note is fully paid, will pay to the mortgagee, the following sums:" (a) the monthly payments on the first mortgage, (b) the monthly payments on the second mortgage, (c) the payments on the third mortgage, and (d) the monthly installments of rent for the hotel grounds and parking facilities ($5,062).

Wrap-around payments were made by Inc. to Ltd. from May 1972 until September 1, 1973. In September 1973, Coral filed suit against Ltd. and Inc. to foreclose its second and third mortgages, the ground of the foreclosure suit being the alleged deterioration and waste of the hotel property. On October 9, 1973, Ltd. mailed a default notice to Lindland, accelerating and demanding payment of the total note indebtedness. The default letter advised that Coral had filed suit to foreclose its mortgages and claimed that this constituted a default of the obligation guaranteed by Lindland.

In November 1973, Lindland, the major financer of Inc., quitclaimed the entire hotel property to Plaza Realty & Management (Plaza), a corporation whose principals were James Johnson and Thaddeus Majcherek. At about the same time Ocean Manor Associates, Ltd. (OMAL) was formed. OMAL was a limited partnership with Inc., Crockett Trust and Plaza being the partners. The announced purpose of OMAL was to acquire Ocean Manor Hotel and turn it into a condominium apartment complex. After Coral had filed its foreclosure suit, Johnson began making mortgage payments on the first mortgage and to Coral on its second and third mortgages and land leases so that all payments were current through March of 1974. Johnson also deposited $50,000 with Coral to cover the alleged waste and deterioration of the hotel and continually attempted to negotiate a settlement with Coral on its pending foreclosure suit. Coral insisted on numerous conditions as prerequisites to any settlement, including cancellation of the lease covering the parking lot across from the hotel and substantial renovation of the hotel building itself. OMAL never met these conditions.

In February 1974, Johnson attempted a settlement with Ltd., which had declared its fourth mortgage and note to be in default. Ltd.'s representative demanded $44,815, principal and interest, plus a $15,000 attorney's fee. Johnson refused to pay the attorney's fee but was willing to pay the principal and interest. If these negotiations between Johnson and the various mortgagors were to be successful, the parking lot lease, which Coral wanted to cancel, would have to have been released from two mortgages, the wrap-around mortgage and a separate fifth mortgage held by Lindland.[2] Ltd. refused to modify its mortgage on the parking lot lease until Lindland consented ostensibly because Ltd. did not want to disturb Lindland's guarantee.

The trial court found that it was not until April 1, 1974, that Inc. defaulted on that

---

2. It appears that the leasehold was the security for the fourth (wrap-around) and fifth mortgages.

portion of the wrap-around note guaranteed by Lindland, even though Inc. made no more monthly payments after September of 1973. The trial court credited to Ltd. that part of Inc.'s payments under the wraparound mortgage and note which were to cover payments under Coral's third mortgage. The reason for doing this was that no payments were due under the third mortgage until October 1, 1976, when a $50,000 payment of interest was due. The trial court further found that Lindland, as guarantor, owed $800,417, principal and interest. The trial court also awarded Ltd. $25,000 in attorney's fees.

Lindland's personal representative appeals from this judgment, arguing that several of Ltd.'s actions, set out above, or the combination of them, were of such a nature as to work a discharge of Lindland's guaranty.

The general, black-letter law of such matters is that a guarantor "may be discharged or released by a breach of the contract of guaranty, or, at least to the extent of the injury, by any act or omission of the guarantee, in breach of his duty, that increases the guarantor's risk or otherwise injures his rights; . . ." 38 C.J.S. *Guaranty* § 67 (1943).

We believe that the law of Florida is in accord. Appellant appears to contend, however, that Florida law is more favorable to discharge than the above, in that under it a mere breach by a guarantee of the contract guaranteed releases the guarantor whether or not his risk is increased or his rights injured by it. In support of this proposition, appellant places primary reliance on *Hollywood Shopping Plaza, Inc. v. Schuyler*, 179 So.2d 573 (Fla.App.1965), and cites other Florida authorities. We note, however, that in *Hollywood* the guarantee's breach of the contract guaranteed was a most material one, and clearly one which increased the guarantor's risk: in a gross violation of his duties stated in the lease guaranteed, a lessor rented space in his shopping center to a direct competitor of his tenant. The Florida court held a guarantor of the lessor's rent released by this action, citing the rule in the form for which appellant contends. Thus, the *holding* in the case in no wise indicates an abandonment of the general rule by Florida, since it is obvious that there the lessor's action greatly increased the risk that the lessor might be unable to make rent payments, and correspondingly that the guarantor might be required to step in. Such material breaches of the agreement guaranteed—and the *Hollywood* court specifically noted that the breach in that case *was* material—have effect, under basic contract law, to discharge the offended party from further duties under the contract guaranteed. And, of course, where the principal is discharged, so is his guarantor.

Thus the instance of *material* breach of the agreement guaranteed may be seen either as a special case under the general rule or even as a different rule of discharge entirely. For the general rule focuses upon the contract of guaranty, the agreement between guarantee and guarantor, and it is only material breaches of the contract *guaranteed* which—among other things [3]—may have effect to discharge the guarantor from his obligations under the contract of guaranty.

Most of the other cases cited by appellant fit into the black letter rule. *See Northwestern Bank v. Cortner*, 275 So.2d 317 (Fla.App.1973) (guarantee failed to prove that it complied with conditions of loan agreement by securing the debtor's accounts receivable, which were to be the primary collateral for the loan; guarantee agreement held to be conditional on securing collateral); *Hudson Marina, Inc. v. Commercial Credit Corp.*, 240 So.2d 650 (Fla.App.1970) (guarantee cancelled insurance on property sold under installments sales contract without notifying guarantor; portion of monthly payments accepted by guarantee were designated for purpose of

---

**3.** Of course, it is not only material breaches of the guaranteed contract which may discharge the guarantor. Even agreements between the principals may do so, where their effect is significantly to vary or increase the guarantors obligations under his agreement of guaranty.

198

paying insurance premiums); *Miami Nat'l Bank v. Fink*, 174 So.2d 38 (Fla.App.1965) (guarantor discharged when guarantee failed to secure accounts receivable, which was to have been collateral, and increased the rate of interest on the whole note); *Tex-Wash Enterprises, Inc. v. Fillmore*, 478 S.W.2d 623 (Tex.Civ.App.1972) (guarantors discharged of an obligation under a lease assignment agreement because one of the original leaseholders did not sign the agreement); *Southwest Savings Association v. Dunagan*, 392 S.W.2d 761 (Tex.Civ.App. 1965) (unilateral change of prime contractor in construction project, which was subject of guarantee agreement).

Convinced that the Florida law does not differ from the general rule in respects significant here, we turn to an application of that law to the actions of Ltd. claimed to work a discharge of Lindland in this case.

Two of these actions need not detain us long: Ltd.'s premature declaration of default and its refusal of Johnson's settlement offer. We are unable to see how a breach of any legal duty—let alone one owed Lindland—could have been involved in Ltd.'s refusal of this settlement offer, since Ltd. owed no one any duty to settle. Nor do we think Ltd.'s early claim of default and attempt to accelerate the note increased Lindland's risk or injured him in any significant manner. These were mere claims—positions assumed, not operative action taken—and their resolution and effect depended upon the final determinations of the court below.

Finally, Lindland contends that Ltd. misinterpreted the guaranty agreement and as a result misapplied the monthly payments made by Inc. A misinterpretation of the guaranty contract creates a dispute that must be settled in some fashion, usually by a judicial decision; but we are unable to see how it operates to increase the guarantor's risk or to affect a change in the guarantee obligation without the guarantor's consent. As an illustration, if the guarantee and the obligor on a loan increase the interest on that loan from seven to eight percent by agreement, the guarantor will usually be held discharged. But if a question of inter-

pretation arises between them as to whether the provisions of a loan require seven or eight percent interest, the guarantor would not be discharged from his obligation; he will be bound as the agreement is finally construed.

As we have noted above, the wrap-around mortgage and the wrap-around note differ somewhat with respect to how the monthly payments are to be applied. The wrap-around mortgage says that the monthly payments should in part go to pay the rent for the hotel grounds and parking facilities, but the wrap-around note does not. Appellant claims that since Lindland signed the wrap-around note and not the wrap-around mortgage, he thus is subject only to the provisions of the note. In making this argument appellant relies on a decision, not appealed and now final, in which the district court held that Lindland had not guaranteed the performance of any obligations imposed by the mortgage. The problem with this argument is that, while Lindland may not have guaranteed the performance of the mortgage, in order to determine how Inc.'s monthly payments were to be applied one must necessarily look to both note and mortgage because each contains provisions relating to this subject.

In examining the mortgage and the note, one could conclude that the mortgagor promised to pay, separately from any payments under the note, the amount of the monthly rent on the grounds and parking lot leases. But this is merely a matter of construction and not a change in the underlying obligation guaranteed by Lindland, unless one views the wrap-around mortgage, which was executed after the note, as an alteration of the terms of the note. But the note itself provides that "all payments may be applied by the holder first to repayment of moneys paid by the holder hereof in accordance with the terms of the mortgage securing the payment of this note, and thereafter shall be applied to payment of accrued interest, and lastly to payment of principal." Appellant argues the inapplicability of this clause by focusing on the words "moneys *paid.*" Lindland argues that the lease payments did not constitute "moneys paid" because Ltd.'s general part-

ner admitted at trial that it was his practice to defer payment of the land lease until after he had received each monthly wraparound payment. This is a very strained argument, and one which we are unable to accept.

In sum, then, we conclude that none of the positions assumed or claims made by Ltd. in the course of the dealings attending Inc.'s failure to carry out successfully the purchase of the hotel had effect to increase Lindland's risk as guarantor significantly or to violate his rights. It was not these claims which activated Lindland's guaranty, but the failure of Inc. to make note payments after September of 1973. The failure to settle with OMAL, a third party—though such a settlement doubtless would have been beneficial to Lindland—could not have constituted a breach of any duty owed Lindland, or likely to anyone else. And as for the premature claim of default and the differences about how payments should be credited, these were not *actions* at all but were positions taken by Ltd. in the course of events which led up to and were resolved by the litigation. The decision below is

AFFIRMED.