OLD COLONY INSURANCE COMPANY, Petitioner

v.

CITY OF QUITMAN, Respondent

No. A-8414.  Decided December 13, 1961
Rehearing Denied January 17, 1962
352 S.W. 2d 452

*Malone, Seay & Gwinn*, Dallas, for petitioner.

*W. D. Brown*, Quitman, *Fulton, Hancock & McClain*, Gilmer, for respondent.

ASSOCIATE JUSTICE GRIFFIN delivered the opinion of the Court.

The respondent, City of Quitman, hereinafter called "City", brought this suit in the District Court of Wood County, Texas, against Johnny Folmar Drilling Company, Inc., and petitioner,

Old Colony Insurance Company, as defendants. The City alleged that it entered into a contract with the drilling company to drill and equip a water well for a sum of money and that the insurance company was surety on the drilling company's performance bond given to the City. City further alleged that drilling company was to drill a test well to a depth of 400 feet, or the Carrizo Sand; that drilling company was to have a test made of the water in this test well in accordance with the instructions and under the supervision of the City's engineer, and to inform the City's engineer of the results of that test; that if the test made showed the water had an iron content of not more than .3 parts of iron to 1,000,000 parts of water, then the engineer would give the drilling company an order authorizing the drilling and completion of the water well to be used by the City. It was further alleged that the drilling company guaranteed and warranted that the completed well would produce water of no greater iron content than that produced by the test well. City alleged that the analysis report of the water from the test well furnished to them by the drilling company showed water within the permissible iron content; that acting upon such report, its engineer ordered the drilling company to proceed with the drilling of the City's well; that upon completion of the City's well, the drilling company pumped the large well and it produced the number of gallons per minute as required by the contract; and drilling company represented the iron content of the water was the same as that taken from the test well. Acting on such belief, and without demanding a test of the water in the completed well as the contract required, the City engineer gave a completion certificate to the drilling company and the City paid the drilling company the balance of $7,151.04 due under the contract for a total of $25,243.35, being the contract price. The City alleged that the water from the City's well had a much higher iron content than the water in the test well and could not be used in its mains for domestic use, and as a result the City sought recovery from the drilling company and the insurance company, as surety, for the full amount paid.

The insurance company and drilling company each filed a separate answer denying liability on various grounds and each adopted in full the answer of its co-defendant. Depositions were taken of Johnny Folmar, president and active manager of the drilling company, of the City's engineer, the City's secretary, mayor, water superintendent and others.

After answers were filed and depositions taken the City filed

a motion for summary judgment supported by an affidavit of the City Secretary.

The insurance company filed a sworn reply to the City's motion for summary judgment and attached thereto an affidavit from one purporting to be an experienced water engineer. The insurance company also filed a supplemental reply to the City's motion for summary judgment. Insurance company also adopted in full the drilling company's reply to the motion for summary judgment.

The drilling company also filed a sworn answer to the City's motion for summary judgment and pointed out what it considered issues of fact. Attached to its answer was an affidavit of Johnny Folmar.

All parties appeared before the trial court on October 23, 1959; and after considering all of the pleadings filed, together with depositions and affidavits, the trial court held there were no genuine fact issues as to the liability of the drilling company and its surety insurance company, and entered an interlocutory summary judgment in favor of the City against the drilling company and the insurance company that the latter two were liable to the City for its damages suffered. The question of the amount of damages was left for a trial on the merits. At this trial, before the Court and without a jury, on May 19, 1960, the court made the summary judgment on liability final, and gave the City judgment against the drilling company and the insurance company for $25,243.35 with interest thereon at 6% from date of entry, August 13, 1960.

On appeal by the drilling company and the insurance company the Court of Civil Appeals reformed the trial court's judgment so as to give the insurance company a judgment over against the drilling company, but otherwise affirmed. 345 S.W. 2d 439. The insurance company filed an application for writ of error, but the drilling company did not appeal from the judgment of the Court of Civil Appeals.

Complaint is also made that the Court of Civil Appeals erred in affirming the trial court's action in granting the summary judgment for City. For the reasons hereinafter set out, we hold the granting of the summary judgment was error.

About July 1 the drilling company finished installing the pump and other equipment the contract required and the City

engineer, without having been furnished a test of the water from the completed well as required by the contract, issued the necessary completion certificate upon which the City, on July 17, 1957, paid the drilling company the balance of $7,151.04 due on the contract price.

Due to inability to secure certain needed electrical equipment and to construct certain necessary facilities, the City did not pump the well until about November 10, 1957, some five months after Johnny Folmar had test pumped the well and made his iron content tests.

By its fourth point, insurance company makes the contention that it was released from liability because the City paid out the final $7,051.04 due the drilling company before a sample of the water from the completed well had been analyzed and the water found acceptable.

In the contract, the drilling company guaranteed a chemical analysis of water equal to that of a sample taken from the test well. The contract provided that the drilling company "shall collect a one gallon sample of water from the finished well and submit same to the Laboratories of the Texas State Health Department, Austin, Texas, for a complete chemical analysis", and that drilling company would furnish the City five certified copies of the chemical analysis. Upon completion of the test pumping of the City's well about June 2, and after the water had cleared, the drilling company did collect a gallon of water from the well to be tested as provided by contract. This sample was given to the City Secretary on June 4, 1957, and he undertook to pack it and mail it to the State Health Department at Austin for a chemical analysis. The drilling company paid the postage on the shipment. At the time the City engineer issued his final completion certificate and authorized the final payment (about July 5), he had received no chemical analysis of the water from the completed well. On July 17, 1957, when final payment was made to the drilling company by the City, no report from the State Health Department had been received, nor had any inquiry been made of the Health Department about the sample. Nothing was done by the City to secure a chemical analysis, nor was any demand made on the drilling company for a chemical analysis of the water from the well, until the water was turned into the City mains during November of 1957 and complaints were made. At this time the City did take a sample and submit it to the State Health Department. This analysis showed an iron content of the water greatly in excess of the permissible limits.

Under the provisions of the contract, the drilling company had not completed its contract with the City and was not entitled to payment until it had furnished the City with a chemical analysis of the water from the completed well, and that analysis showed an iron content not in excess of that in the water from the test well. This the drilling company did not do. Knowing of this failure the City engineer certified and the City paid the drilling company in full for the completed well.

As said in Bullard v. Norton, 107 Texas 571, 182 S.W. 668 (1916):

"It is well settled that sureties are only bound by the precise terms of the contract whose performance they secure, and that any material alterations in the terms of the contract without their consent will release them from liability. * * *"

The above case also holds that the surety is not obligated to make inquiry or to keep watch over the parties to see that no changes are made.

Also see: Ryan v. Morton, 65 Texas 258-262, (1886); Lonergan v. San Antonio Loan & Trust Co., 101 Texas 63, 104 S.W. 1061, (1907); Hess & Skinner Engineering Co. v. Turney, 110 Texas 148, 216 S.W. 621, (1919); Standard Acc. Ins. Co. v. Knox, 144 Texas 296, 184 S.W. 2d 612(3), (1944); Williams v. Baldwin, Comm. App. 1921, 228 S.W. 554; Wright v. A. G. McAdams Lbr. Co., Comm. App., 1921, 234 S.W. 878; Mingus v. Employers' Liability Assur. Co., Comm. App., 1933, 65 S.W. 2d 292; Larkin v. Pruett Lumber Co., Texas Civ. App., 1919, 209 S.W. 443, no writ history; Porter v. Hope, Texas Civ. App., 1926, 279 S.W. 535, writ refused; Aetna Casualty & Surety Co. v. Robertson, Texas Civ. App., 1928, 3 S.W. 2d 895(4), no writ history; Annotations in 12 A.L.R. 382, 127 A.L.R. 10, 77 A.L.R. 222; 43 Am. Jur. 912, Sec. 170; 50 Am. Jur. 932, Sec. 41, et seq.; Id. p. 937, Sec. 48, et seq.

The City cites the case of Mercantile Trust Co. v. Hensey, 205 U.S. 298, 27 S. Ct. 535, 51 L. Ed. 811, 10 Ann. Cas. 572, (1907), as supporting its position that it is entitled to recover its damages for failure of the drilling company to bring in a well with iron content of water same as that in the test well. The point in the Hensey case was that the final certificate of the architect on which payment was made to the contractor did not preclude the filing of suit for damages for failure of workman-

ship or materials. It had nothing to do with changes in the contract between owner and contractor.

City also cites United States v. Walsh, CCA 2d Cir., 115 F. 697, (1902). That case involved a suit between the United States, as owner, and Walsh, as contractor, and the sureties on his performance bond for damages resulting from faulty construction. Walsh claimed that by accepting the work with knowledge of the defects the United States could not sue for damages. The trial judge agreed with this view and directed a verdict for the defendant. The appellate court reversed for a new trial, holding that where the final test of the completed structure was made under conditions which did not permit those making the tests to discover the structural departures from the specifications, the government was not chargeable with the notice of such defects. The court held there were facts which would warrant a jury in so holding; therefore, the instructed verdict was improper.

■ In our case there are no facts which would excuse the City's making final payment when it was well known to the engineer and City secretary that no chemical analysis of the water from the completed well had been made. This is a classic example of the reason for the rule that sureties are released when there is a material alteration in, and deviation from, the terms of the contract without their consent and to their prejudice. Here, for example, from the standpoint of the surety, there is no way of knowing the chemical content of the water in the finished well *at the time it was accepted by respondent,* and whether or not that which intervened in the succeeding months before City turned the water into its mains affected the chemical content of the water. It is apparent that had the water been tested at the time the well was finished and before acceptance by City there could have been one of two results, either of which would have obviated the question of City looking to petitioner under the performance bond: the water *at that time* might have equaled the test hole water analysis; or, if not, the contractor might at that time have been able to find water, or to treat the water, so as to meet the contract requirements. Had the test been made and the water found to be of too high chemical content, and which situation could not be corrected by the contractor, the City would not have made the final payment. Respondent, by its acts, in not requiring compliance with the contract, prevented the happening of either of these possibilities and thereby prejudiced a right of petitioner as surety going to the whole contract. The situation is therefore not one where the contract

deviations failed to prejudice or damage the surety but is one where there is injury to the surety as a matter of law going to the whole contract obligation.

To hold the insurance company liable in spite of these departures from the terms of the contract and bond, the City (owner) relies on the following provisions of the contract:

"Neither the Certificate of acceptance nor the final payment, nor any provision in the Contract Documents, shall relieve the Contractor of the obligation for fulfillment of any warranty which may be required in the Special Conditions of the Specifications."

"Preliminary approval. The engineer shall not have the power to waive the obligations of this contract for the furnishing by the contractor of good material, and of his performing good work as herein described, and in full accordance with the plans and specifications."

The argument of City is that in all events the contractor was under obligation to complete and deliver a well with water corresponding in chemical analysis to the test well, from which the contractor was not relieved by the acceptance and final payment, or by any act of the engineer acting for City, and that this is likewise determinative of the obligation of petitioner as surety on the performance bond.

■ It is at once manifest that the adoption of this line of reasoning would abrogate altogether the rights of petitioner as a surety in the respects previously discussed, and would subject the petitioner to surety liability regardless of any and all contract deviations and alterations. There is a difference between binding the surety to a guaranty of performance without exception where the other party for whom the work is being done adheres to the contract, and where, as here, it is sought to hold the surety regardless of substantial deviations from the contract by the party for whom the work is being performed. The cases cited by City recognize that contract provisions such as those under review entitled the owner to hold the contractor for defective work or improper materials even though accepted by the architect or engineer; these cases do not, however, consider contract deviations of the nature of the case at bar and do not support the proposition that a surety remains bound notwithstanding such contract deviations and alterations.

The obvious purposes of the contract provisions are that the contractor shall not escape liability to the owner for defective work or improper materials which may come to light subsequent to acceptance and final payment; and, for the same reason, that preliminary approval of the engineer shall not have the effect of releasing the contractor from the obligations of furnishing good materials, performing good work and complying with the plans and specifications.

The City further seeks to hold insurance company surety by virtue of the following provision found in the performance bond signed by the surety:

"PROVIDED FURTHER that no final settlement between the Owner and the Contractor shall abridge the right of any *beneficiary* hereunder *whose claim may be unsatisfied,* but the certificate of the Engineer *that any progress payment or final payment* is due the Contractor or his assigns shall, when accepted and acted upon in good faith by the Owner, be conclusive upon the Surety and its successors and assigns." (Emphasis added.)

We notice that this provision discusses the rights of the "beneficiaries hereunder" (being those subcontractors, workmen, laborers, mechanics, and furnishers of material as set out by class in an earlier portion of the bond) and is clearly for their protection. The first clause so shows and is not capable of any other reasonable construction. This provision makes certain that the beneficiaries will get their money so long as any beneficiary shall have an unsatisfied claim. This is true regardless of the fact that the owner may have paid out to the contractor the full contract price. The rest of the paragraph, beginning with the "but", sets out the liability to the *beneficiaries only* as between the owner and the surety. What this last provision says is that if the owner—in good faith and upon the certificate of the engineer that any progress or final payment is due the contractor —pays in accordance with such engineer's certificate, then the owner is released from further payments but the surety is conclusively bound to those beneficiaries holding unsatisfied claims. This is consistent with the right of the owner to have the contract fulfilled at a cost not exceeding the contract price. If there are excess costs they shall fall upon the surety. This is the obligation the surety contracted to discharge.

Here again this provision in no manner attempts to set aside any obligation of the owner upon the contract either with the

contractor or the surety, nor is anything said about binding the surety to the owner. The provision merely says:

1. No settlement will abridge the right of an unpaid beneficiary to recover his unpaid claim.

2. The owner is not liable to the beneficiary if he has paid in good faith.

3. However, the surety remains liable to the beneficiaries on their claims.

The drilling company not having appealed from the Court of Civil Appeals' affirmance of the trial court's judgment in favor of the City against the drilling company, that part of the Court of Civil Appeals' judgment must be affirmed. There having been no motion for summary judgment by the contractor or insurance company, the cause must be remanded to the trial court for further proceedings consistent with this opinion.

Opinion delivered December 13, 1961.