**UNITED CONCRETE PIPE CORPORA-
TION, Petitioner,**

**v.**

**SPIN–LINE COMPANY, Inc., et al.,
Respondent.**

**No. B–642.**

Supreme Court of Texas.

June 26, 1968.

Rehearing Denied July 24, 1968.

Stigall, Maxfield & Collier, Banjamin Raye Collier, Dallas, for petitioner.

Woodruff, Hill, Bader, & Kendall, David M. Kendall, Jr., Dallas, for respondent.

HAMILTON, Justice.

This is an action brought by the payee of a nonnegotiable note with a contract affixed thereto against the maker and endorsers thereon. The trial court rendered judgment for United Concrete Pipe, payee, on a jury verdict against both the maker, Spin-Line Corporation and the endorsers. The court of civil appeals affirmed the judgment against the maker and S. Mort Zimmerman, one of the endorsers, but reversed and rendered judgment that plaintiff, United, take nothing as to the other endorsers. 420 S. W.2d 744. From that judgment both parties, i. e., Spin-Line and S. Mort Zimmerman, as well as United have sought relief by writ of error. Our disposition of Unit-

ed's application renders the points raised by Spin-Line and Zimmerman immaterial.

The opinion of the court below affords a detailed discussion of the facts involved, but due to their complexity a résumé is in order. In 1963 Shell Pipeline Corporation was awarded a contract to construct a pipeline to furnish water to the Permian Basin area of Texas for a water flooding project. The name of the project is the El Capitan Water System. Shell then invited competitive bids to secure the requisite supply of concrete pipe to fulfill their contract. Of the bids submitted Spin-Line was the lowest and United was the next. Spin-Line was awarded the contract, and on November 22, 1963 entered into a written contract with Shell pursuant to which Spin-Line agreed to furnish concrete pipe at unit prices set forth in an exhibit attached to the contract; the number of units was not exactly ascertainable, because the total length of the line was not fixed. Delivery was to be effected on or before January 15, 1964.

Spin-Line's pipe manufacturing facilities were not complete when it contracted with Shell to furnish the pipe. Therefore, Shell required that the eight individual stockholders of Spin-Line indemnify Shell, and that they execute individual indemnity agreements with a maximum of $300,000 liability.

### NEGOTIATIONS BETWEEN SHELL AND SPIN-LINE

Some time between the date of the contract November 22 and December 17, 1963, it became apparent that Spin-Line would not be able to perform. Zimmerman went to Houston and met with the president and purchasing head of Shell, who affirmed that they were going to hold Spin-Line and the endorsers to the contract. Zimmerman then suggested that United might be induced to assume and perform the contract. On December 17, Lloyd R. French, the president of Spin-Line, wrote Shell a letter and stated that they were unable to perform the contract; but, that with the consent of Shell, Spin-Line would assign the whole contract to United. The following day Shell replied by telegraph that they would prefer a contract direct with United on the same terms as their original one with Spin-Line, and that if such a contract were executed, they would release Spin-Line and the endorsers from the November 22 agreement. On December 27, Spin-Line sent a telegram to Shell which authorized Shell to negotiate directly with United for furnishing the pipe contemplated by the Shell-Spin-Line contract. On or about January 9–10, Messrs. Young and Fenton, the sales representatives of United, went to the office of Mr. Galbraith, Shell's purchasing head in Houston, Texas. A purchase order contract containing exactly the same unit prices as the Shell-Spin-Line contract was agreed on by United and Shell. This contract, as the former, provided that the number of units supplied could fluctuate although the price per unit was fixed. Either contemporaneous with or immediately after the execution of the purchase order contract, Shell sent a letter to Spin-Line declaring their contract in default and releasing and discharging the endorsers from any further obligation under their indemnity agreements to Shell. No claim has been asserted by Shell against any of them or Spin-Line.

### NEGOTIATIONS BETWEEN SPIN-LINE AND UNITED

Zimmerman initially contacted George Curtiss, President of United, by phone, and he eventually went to California to discuss the assumption of the contract by United. On December 30, Spin-Line by Zimmerman sent a "Memorandum of Understanding" to Curtiss. The pertinent portions are as follows:

"In consideration of United agreeing to be substituted in the place * * * of Spin-Line, Spin-Line agrees to pay to United the sum of $214,350 for the performance [of the Shell-Spin-Line contract]. Such sum or sums shall be estab-

lished by a promissory note payable on or before July 1, 1964, to be executed by Spin-Line and all of the persons who have individually entered into the Indemnity Agreement provided to Shell as required in the aforesaid contract dated November 22, 1963. * * *

" * * *

"It is the intent of Spin-Line to dispose of its concrete pipe fabricating facilities located at Odessa, Texas, *for use in a foreign country.*" (Emphasis added.)

This memorandum was executed by Curtiss, who sent a letter in reply that United was in agreement with the proposed terms. On January 9, Russell Bergman, House Counsel for United, and Mr. Young came to Dallas and met with Messrs. Zimmerman, French and Marsh, Zimmerman's attorney. The purpose of the meeting was to enter into negotiations looking toward the consummation of an agreement whereby United would take over the Shell contract from Spin-Line. Mr. Young participated in the meeting on the 9th, but had to return to Houston where he proceeded with the purchase order contract with Shell on Bergman's instruction telephoned from Dallas.

At the termination of the Dallas negotiations Bergman returned to California with an instrument denominated "Agreement" signed Spin-Line Company Inc., by Lloyd French. This "Agreement" is set out in its entirety at 420 S.W.2d 747. We quote the pertinent provisions:

"WHEREAS, Spin-Line has heretofore entered into a contract dated November 22, 1963 with Shell Pipe Line Company * * *; and

"WHEREAS, the parties hereto are in mutual agreement that United should be substituted for Spin-Line in aforesaid agreement; and

"WHEREAS, Spin-Line desires to obtain the assistance of United in completing its concrete pipe fabricating facilities located at Odessa, Texas, primarily for the purpose of selling the same for use in a foreign country; and

"WHEREAS, *it is deemed in the best interest of United to cause the completion of these facilities in order that they shall be sold out of the United States;* (Emphasis added.)

"NOW THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, * * *

"1.

"Spin-Line will cause Shell to enter into a contract with United covering the same work as specified in aforesaid contract dated November 22, 1963 and thereafter to release Spin-Line from all obligation and responsibility under said contract.

" * * *.

"3.

"In the event that Shell agrees to increase the *contract* price of the new contract with United to an amount in excess of the *contract* price to Spin-Line, the amount which Spin-Line shall be obligated to pay to United * * * shall be reduced by the amount of such increase in *contract* price, and aforesaid promissory note shall be modified accordingly. (Emphasis added.)

"4.

" * * *.

"(b) Upon the consummation of a sale outside of the United States, United will grant to said purchaser a royalty-free use of the pertinent United patent rights and processes. *United requires under the terms of this contract that Spin-Line sell these facilities outside the United States.* (Emphasis added.)

When Bergman arrived in California, Curtiss examined the instrument. He testified

that the emphasized language was different from what he had previously agreed to. He, therefore, had the first three pages retyped and omitted the emphasized portions of the preamble and the fourth provision. To the preamble he added the language "WHEREAS, United desires to assist Spin-Line in the sale of its facilities," and changed the third provision from "contract price" to "unit price". This instrument was then signed by Bergman and a copy of it was sent to Zimmerman with a cover letter dated January 27, 1964.

On January 25, 1964, Zimmerman sent the original of the note that is the basis of this action to Bergman. Since the several endorsers lived in various locales, it had been necessary to circulate it for their signatures, hence there was no delivery of this note on January 10. The note read as follows:

" 'Promissory Note

" 'Dallas, Texas

" 'January 10, 1964

" 'Upon presentment on July 31, 1964 at the offices of the undersigned corporation in Odessa, Texas, the undersigned promises to pay to United Concrete Pipe Corporation, the sum of One Hundred Ninety-Eight Thousand Eight Hundred Fifty and no/100 Dollars ($198,850.00), without interest.

" ' *   *   *.

" 'This note is subject to the terms and conditions of that certain Agreement between the undersigned corporation and United Concrete Pipe Corporation of even date. This note is non-negotiable.

" 'SPIN LINE COMPANY, INC.
" 'By
" ' /s/ Lloyd R. French
" 'President

" 'The undersigned without presentment or protest hereby each endorse the above note to the extent of twelve and one-half percent (12½%) of all amounts due thereunder.' "

[Signatures and addresses of the eight endorsers.]

Thereafter, United performed its contract to the satisfaction of Shell; and while Spin-Line asserted that United did not assist in the completion of the plant nor aid them in securing a purchaser for those facilities, the evidence indicates that Spin-Line's employees were shown through United's facility—no demonstration was refused them—and that on several occasions Mr. James A. Watts, who was Superintendent of United's Odessa plant, held demonstrations for Spin-Line personnel and would-be purchasers from Virginia. At the time of suit no sale of these facilities had been consummated. The jury found, in response to a special issue, that United had fully performed all the terms and obligations that the "Agreement" purported to require of it.

The jury further found: (1) That the changes in the "Agreement" did not amount to material changes, defined as "a change that would have caused Spin-Line or any of the endorsers to have refused to agree to the contract with the language in question deleted"; (2) that the draft of the contract prepared by United was more favorable to Spin-Line; (3) that Mort Zimmerman had the actual and apparent authority to accept the changed draft on behalf of Spin-Line and the endorsers and that such draft was so accepted.

■ The Spin-Line group in their motion for instructed verdict, *for judgment non obstante veredicto*, and for new trial as well as by counter point here, have asserted that the court erred in rendering judgment for United, because as a matter of law the undisputed evidence showed that there was never any meeting of the minds of the parties. The contention is that United rejected Spin-Line's offer of January 10, 1964, and did no more than make a counter offer by submitting the revised

instrument to them and therefore there was no "Agreement of even date" upon which to predicate any liability. It is well settled that an acceptance must not change or qualify the terms of the offer. If it does, the offer is rejected. Humble Oil & Refining Co. v. Westside Investment Corp., Tex., 428 S.W.2d 92 (May 4, 1968). This rule is not without qualification, however, and performance of that act which the offeree was requested to promise to perform may constitute a valid acceptance. 1 Williston on Contracts, § 78 A (1936 ed.). This Court in Fort v. Barnett, 23 Tex. 460–464 (1859) held that, "[A]lthough Barnett (the offeror) may have had the right, in the meantime, and before its performance, to have withdrawn his consent; still not having done so, and his proposition having been accepted and acted on, by performing the condition embraced in its terms, which had relation to acts with other persons, and not (the offeror) there was not only a valuable consideration for the contract but it had been completed, by a full compliance with its terms." A further amplification of this rule is found in Restatement (Second) of Contracts §§ 31, 63 (Tent.Draft No. 1, 1964).

§ 31. "INVITATION OF PROMISE OR PERFORMANCE.

"In case of doubt an offer is interpreted as inviting the offeree to accept either by promising to perform what the offer requests or by rendering the performance, as the offeree chooses.

§ 63. "EFFECT OF PERFORMANCE BY OFFEREE WHERE OFFER INVITES EITHER PERFORMANCE OR PROMISE.

"1. Where an offer invites an offeree to choose between acceptance by promise and acceptance by performance, the beginning of the invited performance or a tender of part of it is an acceptance by performance.

"2. Such an acceptance operates as a promise to render complete performance."

When these principles are applied to the fact of the case at bar, it is evident that United accepted the "Agreement" on January 10, 1963, and that there was a meeting of the minds at that time. As above stated the jury found that United had fully performed the terms of the "Agreement". The undisputed evidence conclusively establishes that immediately subsequent to and on the same day as the negotiations between Bergman and Zimmerman in Dallas, Young, pursuant to Bergman's instructions, agreed to the purchase order contract with Shell and that immediately thereafter Shell did release Spin-Line and the endorsers from the November 22 contract. It is clear that this was the performance of a most important provision of the "Agreement", as such performance was required by its first provision, quoted above. We, therefore, overrule the contention of Spin-Line, et al., and hold that the "Agreement" was accepted and rendered mutually enforceable on January 10, 1964.

■ We now consider both the contention of United that "the Court of Civil Appeals erred in holding, as a matter of law, that the deletion of the language, 'United requires under the terms of this contract that Spin-Line sell these facilities outside the United States,' was a material change and negated any meeting of the minds of the parties"; and that of Spin-Line that the change of the term "contract price" to "unit price" in paragraph 3 of the "Agreement" was such a material change and that the court erred in not so holding. Concerning the latter change, the court held that upon the facts of this case "the use of the terms 'unit price' and 'contract price' were synonymous." We agree. Clearly this provision was intended only to apply if Shell were willing to increase the amount payable to United and if such increase were precipitated by a variation from the provisions of the Spin-Line-Shell agreement. As heretofore noted, due to the nature of the construction, the total number of units to be furnished Shell was unascertainable; consequently there could

be no true "contract price" in the sense of a product of the price per unit multiplied by the number of units. Therefore, an increase or diminution of the number of units required by Shell would be supplied in strict conformity with the terms of the contract and any such variation in the quantum would not be an "increase", and would not entitle Spin-Line to the benefits of paragraph 3. The only true variation that would precipitate an increase in price would be a change in the price per unit. Therefore, the change from "contract" to "unit" price in this context did not change the legal effect of the language and hence cannot be said to have been material.

The propriety of the court's holding that the removal of the restrictions upon the sale of the Spin-Line facilities was a material alteration, is a much more complex question. As the foundation for its holding, the court cited 3 Tex.Jur.2d Alteration of Instruments § 10 (1959), and stated: "It is also the general rule that whether the altered and changed contract is more favorable or beneficial to the party sought to be charged thereon is not material or pertinent in deciding the question of the validity of the contract." The court further said that, "while it is argued that the change made by United would be more profitable and favorable to Spin-Line such fact, if it is a fact, has no material bearing upon the question to be resolved." In determining the question of the vitiating effect of this alteration, we must examine the foundation of the general rule. In Ryan v. Morton, 65 Tex. 258 (1886) this court announced the rule substantially as that applied by the court of civil appeals. "It is well settled that the liability of a surety cannot be extended beyond the terms of the contract out of which his obligation arises. If the contract be altered without his consent, whether he sustain injury or the contract be to his advantage, it ceases to be his contract, and with that ceases his obligation." Ryan, supra at p. 260. The following cases are to the same effect: Bullard v. Norton, 107 Tex. 571, 182 S.W. 668 (1916); Baldwin v. Haskell National Bank, 104 Tex. 122, 133 S.W. 864, 134 S.W. 1178 (1911); Lonergan v. San Antonio Loan & Trust Co., 101 Tex. 63, 104 S.W. 1061, 106 S.W. 876 (1907); Otto v. Halff, 89 Tex. 384, 34 S.W. 910 (1896); Taylor v. Moore, 20 S.W. 53 (Tex.Comm.App.1892, opinion adopted); Clark v. Cummings, 84 Tex. 610, 19 S.W. 798 (1892); Gardner v. Watson, 76 Tex. 25, 13 S.W. 39 (1890); Lane v. Scott, 57 Tex. 367 (1882); Yeary v. Smith, 45 Tex. 56 (1876); Bogarth v. Breedlove, 39 Tex. 561 (1873); Park v. Glover, 23 Tex. 469 (1859). None of the above cited cases, and no case by this court has been discovered, which has carried the doctrine announced to the extent of discharging the surety merely by reason of the creditor's agreement with the principal to make a change in the principal contract which was manifestly beneficial to the surety and involves no possibility of damage to it. Indeed in each case after noting the announced doctrine, this court has proceeded to demonstrate how the risk of injury to the surety was enhanced or the manner in which the surety was in fact injured. In Old Colony Ins. Co. v. City of Quitman, 163 Tex. 144, 352 S.W.2d 452 (1961) this court again relied on the fact that the surety was prejudiced by the alteration but distinguished the case in which there was no possibility of harm. The court said at p. 456:

> "Respondent, by its acts, in not requiring compliance with the contract, prevented the happening of either of these possibilities and thereby prejudiced a right of petitioner as surety going to the whole contract. The situation is therefore not one where the contract deviations failed to prejudice or damage the surety but is one where there is injury to the surety as a matter of law."

The foundation of the general rule was that the court would not engage in a "vast variety of speculation, upon which no sound principle could be built." Lane v. Scott, supra 57 Tex. at p. 371. This basis disappears, however, when the change is of the

class that by its very nature cannot increase the risk of the surety, for with the test that the change must neither actually injure nor enhance the risk of injury to the surety, the determination is strictly limited and will not permit speculation. The question is not one of quantum of injury or risk of injury but is "does a possibility of injury exist?" Other jurisdiction, although influenced by similar precedents, have refused to discharge the surety. In Becker v. Faber, 280 N.Y. 146, 19 N.E.2d 997 (1939) the New York Court of Appeals explained this result. Since the remission by the creditor of a right which he held under the principal contract did not and could not burden the surety with any obligation not already assumed by it, nor change the nature of the performance required, the original obligation still remains untouched by such remission, and the surety subject to suit thereon. See Restatement of Surety § 128 (1941); Annot., 121 A.L.R. 1014 (1939); Stearns, The Law of Suretyship, § 6.12 (5th ed. 1951); 4 Williston on Contracts § 1240 at 3555 (1936 ed.).

We hold then that where the nature of alteration is such, that as a matter of law can only be beneficial to the surety, he is not discharged. Applying the announced rule to the deletion of the restriction upon the sale of the Spin-Line facilities outside the United States, we hold that said deletion did not discharge either Spin-Line or the endorsers on the non-negotiable note of January 10, 1964. The deletion did not and could not impose any additional duties not already assumed by Spin-Line; indeed, it could only serve their benefit by expanding the sphere of potential purchasers of the facilities.

We affirm the judgments of the courts below rendered against Spin-Line Company and S. Mort Zimmerman. We reverse that part of the judgment of the court of civil appeals which rendered judgment for the other endorsers, and as to them the judgment of the trial court is in all things affirmed.