# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00270-CV

**Cumberland Casualty & Surety Company, Appellant**

**v.**

**Nkwazi, L.L.C., Appellee**

### FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT
### NO. 22,992, HONORABLE HAROLD R. TOWSLEE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This case arises out of a surety's obligation under a performance bond. Appellee Nkwazi, L.L.C. ("Nkwazi"), a limited-liability company owned and operated by four persons, including Kalpesh Patel and Rajeev Patel,[1] contracted with Salinas Construction & Design ("Salinas") for the construction of a motel in Bastrop. Appellant Cumberland Casualty & Surety Co. ("Cumberland") issued performance and payment bonds to Salinas as part of Nkwazi's requirement for financing. After repeated problems between Nkwazi and Salinas, Nkwazi declared Salinas in default and filed a claim against the performance bond. Cumberland refused coverage, and Nkwazi sued Cumberland. Following a jury trial, the district court rendered judgment, awarding Nkwazi actual damages, attorney's fees, and prejudgment interest. Cumberland appeals, arguing that: (1)

---

[1] For clarity we will refer to the Patels by their first names.

the jury's findings were against the great weight and preponderance of the evidence, (2) the district court erred in awarding appellate attorney's fees contrary to the jury answers, and (3) the district court erred in awarding Nkwazi prejudgment interest at a rate of ten percent per annum. We will affirm the district-court judgment.

**Cumberland's Failure to Perform**

By its first issue, Cumberland argues that the jury's finding that Cumberland's failure to perform under the bond was not excused was so against the great weight and preponderance of the evidence as to be manifestly unjust—a challenge to the factual sufficiency of the evidence. *Oram v. State Farm Lloyds*, 977 S.W.2d 163, 168 (Tex. App.—Austin 1998, no pet.); *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275-76 (Tex. App.—Amarillo 1988, writ denied). Specifically, Cumberland disputes the jury's answers to Questions 2 and 3. Question 2 asked: "Was Cumberland['s] [] nonperformance under its Performance Bond excused by Nkwazi['s] [] failure to satisfy conditions precedent to recovery under the Performance Bond?" Question 3 asked: "Was Cumberland['s] [] failure to comply with the Performance Bond excused?" The jury answered "No" to both questions. Cumberland does not dispute that it failed to comply with the performance bond. Rather, Cumberland argues that its obligations under the bond were discharged because Nkwazi materially altered the bonded contract by not hiring an architect to inspect Salinas's work, leading to a substantial overpayment for work Salinas either improperly performed or failed to perform. This, Cumberland argues, destroyed a condition precedent to bond performance.

The performance bond followed the format of American Institute of Architects document A312. Paragraph 3 delineated the requirements for bond performance. It required that

2

there be no "Owner Default," and if no owner default, then "the Surety's obligation under this Bond shall arise." Cumberland asserts that Nkwazi's failure to hire an architect violated paragraph 12.4 of the bond. Paragraph 12.4 defines "Owner Default" as: "Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or *comply with the other terms thereof.*" (Emphasis added.)

In response, Nkwazi argues it was not in default because its contract with Salinas did not require Nkwazi to hire an architect to inspect the construction. Specifically, Nkwazi asserts that a bid proposal by Salinas (the "Proposal") was the only contract between Nkwazi and Salinas and there was no "owner default" or material alteration of that agreement.[2] Cumberland asserts that the Proposal required Nkwazi and Salinas to execute an "AIA [American Institute of Architects] Standard Form Construction Contract" ("AIA Contract"), and Nkwazi should be held to the AIA Contract provision that required it to employ an architect.[3]

---

[2] The "Bid Proposal Form" contained the following language:

> Bidder has carefully examined the form of contract, instructions to bidders, profiles, grades, specifications and the plans therein . . . and will do all the work and furnish all the material called for in the contract DRAWINGS and specifications . . . . In the event of the award of a contract to the undersigned, the undersigned will execute same on [an AIA] Standard Form Construction Contract and make bond for the full amount of the contract, to secure proper compliance with the terms and provisions of the contract . . . . The work proposed to be done shall be accepted when fully complied and finished to the entire satisfaction of the Architect and the Owner.

[3] Cumberland argues that the appropriate contract was AIA Document A101. Such document requires, *inter alia*, that: "Final payment . . . shall be made by the Owner to the Contractor when . . . a final Certificate for Payment has been issued by the Architect." A101 also incorporated by reference AIA Document A201, which requires: "The Architect will provide administration of the Contract as described in the Contract Documents, and will be the Owner's representative (1) during construction, (2) until final payment is due . . . . The Architect will advise and consult with

3

In evaluating factual sufficiency, we review the entire record and set aside the finding only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Oram*, 977 S.W.2d at 168. We may not reverse simply because we conclude that "the evidence preponderates toward an affirmative answer"; instead, we may only reverse where "the *great* weight of [the] evidence supports an affirmative answer." *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

The record reflects that Nkwazi entered into a franchise agreement with Comfort Inn, which provided Nkwazi guidelines for the motel's construction. Nkwazi employed an architect who drafted drawings and created a "specifications book" based on the guidelines. Comfort Inn then approved Nkwazi's plan, allowing Nkwazi to solicit construction bids. In 1997 Nkwazi sent bid packages to numerous contractors, which included the plans and specifications created by Nkwazi's architect. Eventually, Nkwazi accepted Salinas's construction bid of $1,089,000. Rajeev testified that after choosing Salinas, he asked Salinas to send Nkwazi a contract, and Salinas sent Rajeev the Proposal.[4] Both Rajeev, for Nkwazi, and Salinas signed the two-page Proposal, which was dated January 3, 1997. Rajeev and Kalpesh testified that this was the only contract to which the parties agreed. To obtain financing, Nkwazi received a Small Business Administration Loan, funded by First State Bank of Austin. Rejeev testified that the only contract documentation that he initially presented to the bank to secure the loan was the Proposal.

---

the Owner. The Architect will visit the site at intervals appropriate to the stage of construction to become generally familiar with the progress and quality of the completed Work . . . ."

[4] The Proposal was a form included in the specifications book prepared by Nkwazi's architect.

The bank required that the project be bonded, and Cumberland agreed to issue performance and payment bonds to Salinas. The bond request from Salinas's bond agent to Cumberland stated that the motel contract date was "1/?/97," and the amount requested was "$1,089,000." Cumberland issued an original bond, for Phase I, for half the cost of construction; it was dated April 17, 1997. In August Cumberland issued a rider for the remainder of the contract, covering Phase II. Nkwazi paid Salinas's $17,000 premium. Thomas West, Cumberland's Dallas branch manager, testified that Cumberland had investigated Salinas's "prior contract performance," and a compilation of Salinas's financial data before issuing the bond. Cumberland required that a fund administration service be used to monitor the payments made to Salinas.

Construction began in April 1997, and Nkwazi paid Salinas as the project progressed. During construction Salinas neglected to follow the construction plans and defects in his work became apparent. Meetings occurred between Nkwazi and Salinas to correct the defects. Salinas did remedy some of the problems; however, others remained. Rajeev testified that toward the end of 1997 communications with Salinas became more difficult and less frequent. To complete construction, Nkwazi worked directly with the subcontractors to correct Salinas's insufficient work. Rajeev testified that during construction he did not have an architect inspect the progress of the motel; he also testified that he did not know of such a requirement and did not know that architects "provided that service." Rajeev, and later Kalpesh, monitored Salinas's progress by periodically visiting the construction site; when defects were discovered, Rajeev brought them to Salinas's attention. In early 1998, the fund administration service reported Nkwazi's problems with Salinas and the project's slow progression to Cumberland. Nkwazi retained counsel and notified

5

Cumberland that it was considering a declaration that Salinas was in default. At a meeting among the three parties, Salinas agreed to correct the construction problems, and Nkwazi, at Salinas's demand and Cumberland's suggestion, agreed to set aside $108,917 as retainage to ensure that Salinas and his subcontractors would be paid. Nkwazi and Salinas signed an agreement concerning the retainage, as did West, for Cumberland. Nkwazi, however, continued to experience problems with the construction and, in August 1998, almost one year after the projected completion date, Nkwazi declared Salinas in default. At this time, serious problems in the motel's construction remained. After Nkwazi failed to obtain sufficient responses from Cumberland concerning bond coverage, Nkwazi filed this action against Cumberland.[5]

Viewing the evidence in the light most favorable to the jury's verdict, we find the evidence sufficient to support the jury's answers to Questions 2 and 3. At trial the parties presented conflicting testimony regarding the Proposal. Cumberland, through Rajeev's testimony, presented evidence that the specifications book, presented to Nkwazi by its architect, contained requirements that any contract would be an AIA Contract. The bid-proposal form that Salinas signed and that became the Proposal was also a part of the specifications book. The Proposal's language envisioned that the owner and the builder would sign a separate contract. Rajeev and Kalpesh testified that neither had sufficiently read nor understood all the contents of the specifications book and that they were unaware of the contract requirements. Rajeev stated that he asked for Salinas to send him a contract for the motel's construction, and the Proposal was all that he received. He stated that he was unaware that more was required. Kalpesh presented similar testimony. Rajeev admitted that

---

[5] Salinas declared bankruptcy and was not joined as a party.

6

the Proposal's language indicated that it was not the contract, but he and Kalpesh both testified that they believed that the Proposal was, in fact, their contract with Salinas. Reinforcing this belief was Rajeev's testimony that the bank did not require any other contract, aside from the Proposal, for the small business loan. Rajeev also testified that he was the person supervising Salinas, but that, although possessing a civil engineering degree, he had no construction experience. Both Rajeev and Kalpesh offered testimony concerning the serious nature of the construction problems remaining at the motel.

West testified that Cumberland's file only contained the Proposal and the Phase I and II bonds—no AIA Contract. Moreover, no evidence was adduced at trial that the parties entered into an AIA Contract. The following testimony was offered by West when he was questioned about Cumberland's issuance of the performance bond to Salinas without reviewing the AIA Contract.

[Q]: Why was Cumberland Casualty & Surety Company performance bond then issued in April?

[A]: I believe it's because that's when the contract was signed and it was time to obtain the payment and performance bonds in order for the contractor to move forward in constructing the hotel.

[Q]: Was a signed A.I.A. contract sent to you at the time this bond was issued?

[A]: No.

[Q]: How did you learn that the contract had been entered into?

[A]: It's our understanding the agent provided the information that they had secured contracts and they needed to get the payment and performance bonds issued in order to move forward.

7

The agent West mentions was Cumberland's agent in South Texas. West also testified that Nkwazi had complied with the notice requirements to invoke bond coverage. West stated at trial that he did not think the Proposal represented the contract, but his deposition testimony, introduced at trial, stated the opposite. Similarly, West testified that Cumberland's position was that Nkwazi had not properly paid Salinas in accordance with the contract; yet, in his deposition, West stated that Cumberland's position was that Nkwazi had paid Salinas pursuant to the contract.

When viewed in a neutral light, the entire record does not lead to a conclusion that the jury's finding was manifestly unjust. Cumberland argues that the Proposal was not a valid contract and that Nkwazi and Salinas did not comply with the AIA Contract provisions. Cumberland attempted to show that the Proposal was not a contract but only a bid proposal and offered evidence that Nkwazi failed to comply with the AIA Contract that Nkwazi should have required. Yet, Cumberland issued the bond without an AIA Contract and never demanded that Nkwazi provide one. Cumberland accepted Nkwazi's premium payment. There is no evidence or allegation that Nkwazi misrepresented that an AIA Contract had been signed. That Cumberland's agent assured Cumberland that a contract existed and that the Proposal envisioned that an AIA Contract would be signed is of no benefit to Cumberland. We hold the evidence is factually sufficient to support the jury's finding that Cumberland was not excused from its obligation under the performance bond.

Cumberland relies on *Old Colony Insurance Co. v. City of Quitman* for the proposition that a surety is released from its obligation when there is a material alteration in, and deviation from, the terms of the contract without its consent and to its prejudice. 352 S.W.2d 452, 455 (Tex. 1961). The alleged material alteration is that Nkwazi failed to have an architect inspect

8

the on-going construction, which led to a substantial overpayment of Salinas. Cumberland's reliance on *Old Colony* is misplaced. The applicable contract, as found by the jury, is the Proposal and not the AIA Contract; therefore, by the Proposal's terms, Nkwazi cannot be held to have made a material alteration of a contract that it did not agree to. In *Old Colony*, the City of Quitman paid a well-drilling company the remaining balance due before a contract provision, requiring the testing of the water, had been satisfied. 352 S.W.2d at 453. After payment, the well was tested and the water proved unusable. *Id.* The city then sought recovery from the surety for the full amount paid. *Id.* The supreme court held that making the final payment on the contract before the water test had been completed, as required by the contract, was a material alteration, which prejudiced the surety; thus, no recovery was permitted. *Id.* at 456. Here, Cumberland argues that Nkwazi's overpayment materially altered the AIA Contract; however, the evidence supports the jury's findings that the Proposal, not the referenced AIA Contract, was the contract that Cumberland bonded. Therefore, *Old Colony* is inapplicable because Nkwazi did not materially alter the contract that was in effect. Instead, Cumberland had bonded Salinas's performance under the Proposal, a contract which Cumberland does not argue Nkwazi materially altered. We overrule Cumberland's first issue.

### Appellate Attorney's Fees

By its second issue, Cumberland argues that the district court erred in awarding appellate attorney's fees contrary to the jury's answers to Question 5. In response to Question 5, the jury awarded $84,783.71 in attorney's fees to Nkwazi. The jury, however, awarded zero dollars to Nkwazi for each of the following subparts concerning appellate attorney's fees: (1) for an appeal to the court of appeals, (2) for petition to the Supreme Court of Texas, and (3) for an appeal to the

9

Supreme Court of Texas in the event petition was granted. Nkwazi filed a motion to disregard the jury's answers. In the final judgment, the district court ordered that Cumberland pay Nkwazi $25,000, $10,000, and $5000, respectively, "in the event" these appeals were filed. Cumberland contends that the district court's order was made in error. Nkwazi, however, argues that the uncontroverted evidence concerning appellate attorney's fees established the amount as a matter of law, and the district court's decision should be affirmed.

A trial court may disregard the jury's negative finding and substitute its own affirmative finding only if the evidence conclusively establishes the affirmative finding. *Brown v. Bank of Galveston, Nat'l Ass'n*, 930 S.W.2d 140,145 (Tex. App.—Houston [14th Dist.] 1996), *aff'd*, 963 S.W.2d 511, 515-16 (Tex. 1998). The amount of attorney's fees to be awarded is a question of fact and must be supported by credible evidence; this amount rests in the sound discretion of the trial court and its findings will not be disturbed, absent an abuse of discretion. *A.V.I., Inc. v. Heathington*, 842 S.W.2d 712, 718 (Tex. App.—Amarillo 1992, writ denied); *Travelers Ins. Co. v. Brown*, 750 S.W.2d 916, 918-19 (Tex. App.—Amarillo 1988, writ denied). While the fact finder ordinarily determines the reasonableness of the amount, the decision may not be arbitrary. *Gunter v. Baily*, 808 S.W.2d 163, 166 (Tex. App.—El Paso 1991, no writ). Evidence of attorney's fees that is clear, direct, and uncontroverted is taken as true as a matter of law, especially when the opposing party has not rebutted the evidence. *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990). Testimony by an interested witness may establish the amount of attorney's fees as a matter of law only if: (1) the testimony could be readily contradicted if untrue; (2) it is clear, direct, and positive; and (3) there are no circumstances tending to discredit or impeach it. *Id*.

At trial, Nkwazi presented expert testimony concerning reasonable attorney's fees from Robert Shaffer, an attorney for Nkwazi. He testified as to the reasonableness of the requested fees for trial, as well as the fees that might be required in the event of an appeal to the court of appeals and the supreme court. Cumberland did not offer an expert of its own to refute Shaffer's testimony. Cumberland did extensively cross-examine Shaffer regarding attorney's fees accrued by Nkwazi related to the pretrial events and up to the trial itself. However, Cumberland did not cross-examine or offer any controverting or impeaching evidence concerning the requested appellate attorney's fees. The evidence that $40,000 was a reasonable attorney's fee for potential appeals was clear, direct, and positive and could have been readily controverted if the amount was not reasonable. *See Cale's Clean Scene Carwash, Inc. v. Hubbard*, 76 S.W.3d 784, 788 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Therefore, Nkwazi established as a matter of law the amount of attorney's fees, and the district court did not err in awarding a reasonable amount as shown by the evidence. We overrule Cumberland's second issue.

**Prejudgment Interest**

By its third issue, Cumberland argues that the district court erred in awarding Nkwazi prejudgment interest calculated at the rate of ten percent per annum. Cumberland, citing an earlier version of section 302.002 of the finance code, contends that the appropriate rate should have been six percent per annum because the contract ascertains an amount payable. *See* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 1, sec. 302.002, 1997 Tex. Gen. Laws 3091, 3422 (amended 1999) (current provision at Tex. Fin. Code Ann. § 302.002 (West Supp. 2003)); *Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1*, 950 S.W.2d 371, 372-73 (Tex. 1997). Specifically, Cumberland

11

argues that the performance bond and the underlying AIA Contract, which Nkwazi should have used, defined Cumberland's contractual obligation under the bond. Alternatively, Cumberland argues that if this Court holds that the Proposal is the contract in effect, then the interest rate should still be calculated at six percent because the project specifications referenced in the Proposal provide that AIA form A201constitutes the "general conditions of [the] contract" and "clearly spell out the method by which damages for the Contractor's breach are to be calculated." Cumberland concedes that the "time frame adopted by the trial court was accurate." Nkwazi argues that the court did not err because the Proposal is the contract and read in conjunction with the performance bond, provides no method for ascertaining Salinas's or Cumberland's liability. Because we have held that the Proposal is the contract between Nkwazi and Salinas, we accept Nkwazi's argument.

In a breach-of-contract cause of action, prejudgment interest is calculated as simple interest and is based on the postjudgment interest rate applicable at the time of judgment. *Johnson & Higgins, Inc. v. Kenneco Energy*, 962 S.W.2d 507, 532 (Tex. 1998). In *Johnson & Higgins*, the supreme court held that there are two legal sources for an award of prejudgment interest: (1) general principles of equity and (2) an enabling statute. *Id.* at 528. Under the finance code, prejudgment interest applies only to judgments in wrongful death, personal injury, property damage, and condemnation cases. Tex. Fin. Code Ann. §§ 304.102, .201 (West Supp. 2003); *Johnson & Higgins*, 962 S.W.2d at 530. Because Nkwazi's breach-of-contract claim does not fall within the statutory provisions, prejudgment interest is governed by the common law. *Johnson & Higgins*, 962 S.W.2d at 530. Prejudgment interest accrues at the rate for postjudgment interest and shall be computed as simple interest. *Id.* at 532; *see also International Turbine Servs., Inc. v. VASP Brazilian Airlines*,

12

278 F.3d 494, 500 (5th Cir. 2002). Under the finance code, postjudgment interest is computed under the provisions of section 304.003; therefore, prejudgment interest is ten percent per annum, simple interest. Tex. Fin. Code Ann. § 304.003(c) (West Supp. 2003).

Cumberland's reliance on the earlier version of the finance code is misplaced. The provisions of former section 302.002 do not govern the calculation of prejudgment interest in this action. *See Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 330 (Tex. App.—Houston [14th Dist.] 2003, pet. filed) (section 302.002 does not apply to award of prejudgment interest). The district court was thus correct in ordering that prejudgment interest should run at ten percent per annum. Cumberland's third issue is overruled.

## Conclusion

We affirm the district-court judgment.

_____

Lee Yeakel, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed: June 12, 2003

13