IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF 
TEXAS
 
════════════
No. 
02-0730
════════════
 
Excess 
Underwriters at Lloyd’s, London and Certain Companies Subscribing Severally but 
not Jointly to Policy No. 548/TA4011FO1, Petitioners,
 
v.
 
Frank’s 
Casing Crew & Rental Tools, Inc., Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the 
Fourteenth District of Texas
════════════════════════════════════════════════════
 
 
Argued September 24, 2003
 
 
Justice Wainwright, concurring.
When 
an insurer seeks reimbursement from its insured after paying to settle claims 
later determined not to be covered under the insurance policy, may contract and 
quasi-contract principles be considered in determining whether a right to seek 
reimbursement of the settlement payment arises?[1] 
In Texas, prior to today, the answer was “no” under almost all circumstances, 
even though the insurer had timely reserved its right to contest coverage.
This 
rule was established in Texas Ass’n of Counties 
County Government Risk Management Pool v. Matagorda County. 52 S.W.3d 128 
(Tex. 2000). Matagorda County precluded reimbursement to an insurer of 
settlement payments made to resolve claims that are later found not to be 
covered, and allowed reimbursement to be sought by the insurer “only if 
it obtains the insured’s clear and unequivocal consent to the settlement 
and the insurer’s right to seek reimbursement.” Id. at 135 (emphasis 
added). Matagorda County erected this uncommon standard for contract 
formation even though the standard eschewed traditional common law contract 
principles on the tenets necessary to establish a right to recover. The Court 
further concluded that quasi-contract theories of quantum meruit and unjust enrichment would not support the insurer’s 
claim of a right to reimbursement. Id. at 134-36. Quasi-contracts may be 
established under the common law, but Matagorda County precluded the 
normal application of these common law tenets. Id. at 135.  A contract is established when proven by 
a preponderance of the evidence that an offer is accepted, accompanied by 
consideration. See Fed. Sign v. Tex. S. Univ., 951 S.W.2d 401, 408 (Tex. 
1997) (“A contract must be based upon a valid consideration, in other words, 
mutuality of obligation.”); Haws & Garrett Gen’l Contractors, Inc. v. Gorbett 
Brothers Welding Co., 480 S.W.2d 607, 609 (Tex. 1972) (“[T]here must be 
shown the element of mutual agreement which, in the case of an implied contract, 
is inferred from the circumstances.”). Unusual to Texas’ common law of 
contracts, Matagorda County made a contractual agreement in this context 
subject to “clear and unequivocal” proof of acceptance. Matagorda County 
provides no reasoning to support its creation of that standard.
Matagorda 
County left open a very small window for insurers to seek reimbursement of 
settlement payments for claims later determined to be outside policy coverage. 
Although Matagorda County is not expressly overruled by the Court today, 
the small window Matagorda County left open to consider reimbursement is 
widened by the Court’s decision in this case such that the law on reimbursement 
comports with principles of the common law. Hence, consideration by Texas courts 
of common law contract theories and quasi-contract theories (e.g., quantum meruit and unjust enrichment) is appropriate once again in 
determining the rights and obligations of the parties. I concur in the Court’s 
result but join only one of the bases for its outcome, and write to further 
explain that basis. The parties reached an agreement on reimbursement and we 
should decide this case by enforcing their agreement. Therefore, I join section 
II.C. of the Court’s opinion. Although not inconsistent with precedent, the 
remainder of the opinion is based on equitable and policy considerations and 
concludes that the parties are bound by a contract implied in law.
Once 
upon a time, the relationship between insurer and insured was one of contract 
and was governed by the terms and conditions of the policy. See Progressive 
County Mut. Ins. Co. v. Sink, 107 S.W.3d 547, 551 
(Tex. 2003) (insurance policy is a contract to be interpreted according to 
contract principles); Barnett v. Aetna Life Ins. Co., 723 S.W.2d 663, 665 
(Tex. 1987) (“It is a fundamental rule of law that insurance policies are 
contracts and as such are controlled by rules of construction which are 
applicable to contracts generally.”). Even after common law modifications of 
this common law relationship and legislative regulation of the parties’ 
consensual relationship, see, e.g., Tex. Bus. & Com. Code § 17.41B.63; 
Tex. Ins. Code § 541.001B.454; 
Arnold v. Nat’l County Mut. Fire Ins. Co., 725 
S.W.2d 165, 167 (Tex. 1987) (holding that insurers owe a duty of good faith and 
fair dealing toward insureds); G.A. Stowers Furniture Co. v. Am. Indemn. Co., 15 S.W.2d 544, 547 (Tex. Comm’n App. 1929, holding approved) (creating a duty to 
accept reasonable settlement demands within policy limits), it still is 
fundamentally based on the agreement of the parties. See Provident Life & 
Accident Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex. 2003) (as a type of 
contract, insurance policies are interpreted under rules of contract 
construction); Barnett, 723 S.W.2d at 665. In an insurance arrangement 
like the one at issue, the insured and insurer enter an agreement for the 
insurer to cover prescribed risks. Generally, the insured pays premiums to 
protect it against certain unrealized fortuitous costs or damages, up to an 
agreed limit, that it may suffer or be obligated to pay. See 1 Holmes & Rhodes, Holmes’s Appleman on 
Insurance, 2D (1996).
In 
this case, Frank’s Casing agreed to pay premiums for the provision by Excess 
Underwriters of excess insurance coverage in the amount of $10 million. 
ARCO/Vastar sued Frank’s Casing and others after an 
offshore drilling platform partially fabricated by Frank’s Casing for ARCO/Vastar collapsed in the Gulf of Mexico. Excess Underwriters 
issued a reservation of rights letter contesting coverage under its excess 
insurance policy with Frank’s Casing. When settlement discussions were 
unfruitful, the case was tried to a jury. During the heat of trial, with a large 
verdict appearing increasingly likely, Frank’s Casing entered another round of 
settlement discussions directly with the plaintiff ARCO and procured a 
settlement demand of $7.5 million. Frank’s Casing then “Stowerized” Excess Underwriters asserting that the 
settlement offered was reasonable and within policy limits and demanding that 
Excess Underwriters settle the case. Excess Underwriters agreed to pay $7 
million (plus $500,000 from the primary insurer) to settle the case, conditioned 
on its intent to seek reimbursement if it were not required to extend coverage 
to Frank’s Casing for claims at issue at trial and which it was about to resolve 
by settlement.
At 
the time the parties were considering the settlement, both believed they were in 
difficult positions. The record indicates that both parties believed a 
substantial verdict, possibly beyond the excess layer of insurance coverage, was 
likely. Both also knew that their original contract of insurance did not address 
the issue of the insurer’s ability to obtain reimbursement of a settlement 
payment for uninsured claims. Under these circumstances, the following decision 
trees grew.
During 
the trial, Excess Underwriters had to decide whether to pay for settlement of 
claims which it asserted were not covered. It also knew that after being Stowerized, if it did not pay the settlement and did 
not prevail in a declaratory judgment action contesting coverage, it likely 
would face claims for bad faith insurance practices. These claims in Texas have 
on many occasions resulted in large verdicts against insurers which, with common 
law and statutory penalties, have far exceeded actual damages proven. On the 
other hand, if it paid to settle on behalf of its insured, Excess Underwriters’ 
payment would be less than its policy limits, it would avoid a verdict that 
could exhaust its excess limits and it would halt the accrual of attorneys’ 
fees. Effecting a settlement would also avoid a bad faith insurance lawsuit and 
the potential for a punitive damage award against it. Excess Underwriters would 
benefit from the proposed settlement.
Frank’s 
Casing likewise believed that it was faced with the specter of a large jury 
verdict against it. It solicited a settlement offer within policy limits from 
ARCO. Armed with a potential way out, Frank’s Casing demanded that Excess 
Underwriters pay the settlement. The settlement would end the trial and vanquish 
the risk of a large verdict and Frank’s Casing’s potential exposure for amounts 
above the excess limits or for the entire verdict if there were no coverage. 
Plus, by sending a Stowers letter, Frank’s 
Casing upped the ante against Excess Underwriters for if it did not pay the 
settlement, and a large verdict were rendered for which coverage was found to 
exist, Excess Underwriters may have been liable for enhanced damages and 
substantial statutory penalties. In other words, the settlement would also 
benefit Frank’s Casing.
Excess 
Underwriters decided to pay its portion of the settlement but conditioned its 
payment on its right to seek reimbursement if the claim were proven not to be a 
risk the parties had agreed to cover under their insurance policy. The insurer 
sent a letter on February 23, 1998, making this offer to Frank’s Casing. The 
letter further stated that the insurer “will contact Arco/Vasta’s attorney this morning” to settle the claims against 
Frank’s in this case. Frank’s Casing concurred that the settlement was 
reasonable and not only approved but demanded that Excess Underwriters 
consummate the $7.5 million settlement. Excess Underwriters sent a second letter 
on February 23 to confirm the settlement with ARCO and then filed a declaratory 
judgment action contesting coverage that same day. The next day at the hearing 
before the trial court, which had recessed trial to give the parties the 
opportunity to resolve the dispute, the parties dictated their settlement into 
the record. At the hearing after the parties had entered the settlement the 
prior day, Frank’s Casing objected for the first time that Excess Underwriters 
did not preserve its ability to contest “coverage.”
Hence, 
we come to the dispute before this Court. Did Frank’s Casing obtain a 
windfallCi.e., 
payment by its insurer of millions of dollars to settle claims against it for 
which there was no coverage? Or did Excess Underwriters voluntarily pay a 
settlement to obtain the benefits of saving itself potentially millions of 
dollars from the expected verdict and millions more from a possible bad faith 
verdict in a subsequent lawsuit? Two sophisticated entities carefully exercised 
their rights and obligations in light of their potential exposure. Both made 
reasoned decisions they believed to be in their best interests under the 
circumstances. And but for the condition on reimbursement included in Excess 
Underwriters’ offer accepted by Frank’s Casing, I would conclude that there is 
no right to reimbursement. Absent the parties entering into a legally 
enforceable agreement, I do not believe that the equities of the parties’ 
respective circumstances alone supports allowing a right to recoup the 
settlement payment.
I 
agree with the Court that by Stowerizing Excess 
Underwriters, Frank’s Casing acknowledged the reasonableness of the settlement. 
See ___ S.W.3d at ___. But I disagree with the Court that the effect of 
that action supports allowing the insurer to seek reimbursement. If Frank’s 
Casing’s only conduct upon obtaining the $7.5 million settlement offer from ARCO 
was to make a Stowers demand on Excess 
Underwriters and acquiesce to a settlement that did not include the term on 
reimbursement, Excess Underwriters should have no right to reimbursement. 
Threatening to sue does not change the contract between the parties. And such a 
threat should not serve as a sufficient basis to entitle Excess Underwriters to 
obtain reimbursement of its payment. Under these circumstances, it is difficult 
to conceive that Excess Underwriters was under any legally cognizable duress 
that undermined its will and forced it to pay the settlement. Neither the threat 
to exercise a legal right nor legally exercising that right can constitute 
duress. In re FirstMerit Bank, N.A., 525 S.W.3d 
749, 758 (Tex. 2001); Ulmer v. Ulmer, 162 S.W.2d 944, 947 (Tex. 1947). 
There were no allegations of fraud, collusion, or extortion to tilt the scale 
here.
However, 
I conclude that Frank’s Casing, by its acquiescence in the settlement, bound 
itself under principles of contract law to the condition that Excess 
Underwriters would be able to seek reimbursement. Frank’s Casing was not simply 
a beneficiary of its insurer’s settlement, but demanded in a prior letter of 
February 19, 1998, that Excess Underwriters act in a “reasonably prudent” manner 
and accept the settlement offer from ARCO and do so “BEFORE a ruling by the 
court on the contract issues . . . [which] could occur at any time, but will 
occur, at the latest, by the beginning of court Tuesday of next week.” Including 
the weekend, the following Tuesday (February 24) was five days away. Excess 
Underwriters agreed to pay the settlement but as a condition to doing so 
reserved the right to seek repayment from Frank’s Casing if the declaratory 
judgment action determined there was no insurance coverage for the claims at 
issue in the prior trial. The February 23 letter to Frank’s Casing in which 
Excess Underwriters agreed to settle the case on its behalf provided:
 
In 
order to ensure that the favorable settlement will not be lost to both Frank’s 
and [Excess Underwriters], [Excess Underwriters] will fund the settlement up to 
$7,500,000 (less any contribution from the primary policy) and will continue to 
reserve all coverage issues under the Umbrella Policy. [Excess Underwriters] 
will hold Frank’s responsible for and will seek reimbursement of all sums 
paid in settlement of claims for which no coverage exists under the Umbrella 
Policy.”
 
(emphasis 
added). Excess Underwriters then settled the case against its insured the same 
day and faxed written confirmation to ARCO with a copy to Frank’s Casing. 
Frank’s Casing never asserts that it rejected the settlement offer or made a 
counteroffer. Instead, Frank’s Casing acknowledged that it accepted the 
settlement offer from Excess Underwriters but argues that Excess Underwriters 
did not obtain “Frank’s agreement nor its clear and unequivocal consent to seek 
reimbursement.”[2]
The 
February 23 letter to ARCO confirming the verbal settlement also stated that 
Excess Underwriters continued to reserve all rights “against Frank’s as to 
coverage” and, for a second time that day, affirmed that it would “hold Frank’s 
responsible for and will seek reimbursement of all sums paid in settlement of 
claims for which no coverage exists under the Umbrella policy.” Frank’s Casing 
again did not reject but accepted the settlement. After entering the settlement, 
Excess Underwriters filed its declaratory judgment action contesting coverage 
that afternoon.
The 
next morning the trial court recessed the trial to enable the parties to dictate 
their settlement into the record. Frank’s Casing stated that by the February 23 
letter from Excess Underwriters to ARCO it had agreed to pay $7,500,000 to 
settle the case with the plaintiffs. Frank’s Casing then asserted that 
“underwriters have either waived their right to reserve cover [sic] issues or 
alternatively [are estopped] from asserting any 
coverage issues since underwriters have agreed to the settlement.” The court 
rendered judgment on the agreement dictated into the record. The Settlement 
Agreement and Release, signed later by the parties, including Frank’s Casing and 
Excess Underwriters, confirmed that the covenants not to sue and the releases 
between the parties do not apply “to any claims that exist presently or may 
arise in the future between Defendant Frank’s and Frank’s Insurers arising from 
the claims asserted by Plaintiffs.”
Frank’s 
Casing has never disputed that Excess Underwriters’ settlement offer was 
conditioned on a right to seek reimbursement. Frank’s Casing argues that by its 
silence it accepted the part of the settlement offer providing for Excess 
Underwriters to make a $7 million settlement payment but did not accept the 
condition on that promise. The law and the facts do not support Frank’s Casing’s 
position.
A 
contracting party cannot accept the benefits of a contract and disclaim its 
obligations. W.H. Putegnat Co. v. Fidelity & 
Deposit Co. of Md., 29 S.W.2d 1004, 1006 (Tex. 1930) (“Where one accepts the 
benefits of a contract, he must assume its burdens.”). Nor can a party accepting 
an offer validly purport to accept the offer’s benefits, acquiesce in the 
benefits from the offeror’s performance of the 
contract, but later reject the detriments. United Concrete Pipe Corp. v. 
Spin-Line Co., 430 S.W.2d 360, 364 (Tex. 1968) (noting that a party may have 
the right to withdraw his consent before a contract’s performance but not after 
the promise is accepted or performed); see Daniel v. Goesl, 341 S.W.2d 892, 895 (Tex. 1960) (one who 
“receives and accepts benefits under the contract . . . is bound by the terms of 
the contract”); Jerry, The Insurer’s Right to Reimbursement of Defense 
Costs, 42 Ariz. L. Rev. 13, 
71B72 
(2000) (“[A]cquiescence in and acceptance of the 
benefits of [the party’s] performance constitute a manifestation of acceptance 
of the terms on which [the party’s] performance was tendered.”). To effectively 
decline an offer, some terms of which an offeree 
disapproves, the offeree must reject the offer or make 
a counteroffer. See Ashford Dev., Inc. v. USLife 
Real Estate Servs. Corp., 661 S.W.2d 933, 935 
(Tex. 1983) (determining that supplemental provision of loan commitment was a 
counter-offer); Komet v. Graves, 40 
S.W.3d 596, 601 (Tex. App.CSan 
Antonio 2001, no pet.) (attempt to change offer before acceptance operates as a 
rejection and counter-offer). Neither occurred here before the settlement was 
consummated.
Frank’s 
Casing accepted the settlement proposed by Excess Underwriters and thereby 
acquiesced in the terms of the offer, and bound itself to the settlement under 
the law of contracts. In practice in an insurance context, insureds often communicate acceptance of an offer by 
conduct, as in the case of an insured accepting a defense from an insurer which 
reserves its right to deny coverage. In such cases, the insured’s acceptance of 
the defense is an implied consent to the insurer’s reservation of the coverage 
issues, “even in the absence of an express consent or acceptance of the offer.” 
W. Cas. & Sur. Co. v. 
Newell Mfg. Co., 566 S.W.2d 74, 76 (Tex. Civ. 
App.CSan 
Antonio 1978, writ ref’d n.r.e.); see In re Halliburton Co., 80 S.W.3d 566, 
568 (Tex. 2002) (“[W]hen an employer notifies an employee of changes to the 
at‑will employment contract and the employee ‘continues working with knowledge 
of the changes, he has accepted the changes as a matter of law.’”) (citing 
Hathaway v. General Mills, Inc., 711 S.W.2d 227, 229 (Tex. 1986)); 
Blue Ridge Ins. Co. v. Jacobsen, 22 P.3d 313, 317 (Cal. 2001).
Hence, 
during the trial the parties extended their contractual arrangement to address 
the risk of a large verdict by settlement and also agreed on a method to 
allocate the cost. The settlement vanquished the risk of a jury verdict against 
them. The allocation of the cost of settlement would be based on the outcome of 
the coverage suit. If the claims settled were found to be covered by the excess 
policy, Excess Underwriters’ payment of the settlement would end the matter. The 
contractual relationship would function as intended as Excess Underwriters was 
paid premiums to protect Frank’s Casing from covered risks within policy limits. 
If the claims settled were found not to be covered under the insurance policy, 
Excess Underwriters would have its contractual right to seek reimbursement of 
the settlement payment. The relationship of the parties is still one governed by 
contract.
In 
her concurring opinion, Justice 
O’Neill contends that no such agreement was in fact reached, and under 
this contractual implied-in-fact analysis Frank’s Casing may keep the benefit of 
the offer to pay $7,500,000 to settle the case but reject the reimbursement 
condition on the offer. As cited, infra, contract law does not allow her 
approach of “having my cake and eating it, too.” A deal is a deal, and in Texas 
we enforce deals. If, as Justice O’Neill 
asserts, Frank’s Casing really wanted to reject the offer’s condition on 
reimbursement, it could have done so by refusing the $7,500,000 payment on its 
behalf and proceeding with trial, or making a counteroffer that excluded the 
reimbursement condition, or objecting to the reimbursement term before the 
settlement was entered with ARCO. (Frank’s Casing likely did not want to do the 
latter because objecting to the condition would also have rejected the entire 
offer of settlement.) She further asserts that “Frank’s Casing’s reimbursement 
contest implied the insurers’ consent to Frank’s Casing’s reservation of the 
reimbursement question.” Again, neither the law nor the facts support her 
assertion.  Only after the 
settlement with ARCO was entered verbally and confirmed in writing by Excess 
Underwriters did Frank’s Casing assert that Excess Underwriters waived or was 
estopped from raising any coverage issues. Assuming 
the objection to raising coverage issues is an objection to the reimbursement 
condition, a party cannot make a deal and then later selectively reject parts of 
it. See W.H. Putegnat Co., 29 S.W.2d at 1006.[3]
Frank’s 
Casing argues that such a result is unfair. I do not agree. A trial court 
decided that the claims against Frank’s Casing which Excess Underwriters agreed 
to pay to settle were not covered claims under Frank’s Casing’s insurance 
policy. Frank’s Casing did not appeal that determination, and it is therefore 
settled. Frank’s Casing is not entitled to insurance coverage for risks for 
which it paid no premiums. And Excess Underwriters is not obligated to pay for 
risks it did not agree to cover and for which it received no consideration. 
Should the parties have desired to cover such risks, they could have consented 
to such an arrangement by defining the scope of the coverage to include the 
claims at issue, and agreed on premiums to be paid for such insurance. But they 
did not.
The 
parties should sink or swim on the agreements they enter, unless the facts are 
such that they effect a change in the parties’ agreement under principles of 
contract law, are validly affected by the Legislature, or involve fraud, 
extortion or other basis for altering a contract. Accordingly, the factors the 
Court cites as the basis for concluding that the right to reimbursement exists 
are not central to the reimbursement analysis. I disagree with the Court’s 
reasoning that the weight and potential severity of a Stowers or bad faith insurance verdict can serve as a 
basis to alter the agreement of the parties. Insurance is a consensual 
arrangement not subject to change by the threat of a lawsuit. If Stowers or bad faith actions are skewing litigation 
and parties’ legitimate incentives, then Stowers actions may need to be addressed by the 
appropriate branch rather than allow threat of such actions to serve as a basis 
for reimbursement.
In 
summary, I would hold that absent a provision in the insurance policy providing 
for the insured to reimburse the insurer for paying to settle a claim that is 
later held not to be covered, there is no right to reimbursement of the 
settlement payment. However, an insurer should be allowed the opportunity to 
prove a right to recoupment of a reasonable settlement 
under contract law, including under the theories of implied-in-fact contracts 
and quasi-contracts, if the insurer gives notice of its intention to recoup the 
payment in a timely reservation of rights letter or makes reimbursement a term 
or condition of a subsequent agreement.
This 
approach is straightforward and predictable. The current jurisprudence on this 
issue involves a convoluted set of tangled yet important interests and policy 
considerations that, with slight changes in the facts, can lead to widely 
varying results in cases that seem quite similar. Compare Frank’s Casing, 
93 S.W.3d 178 with Matagorda County, 52 S.W.2d 128. Under this Court’s 
opinions, the adjudication of each case is based on the equities of the parties 
which will lead to a series of case-by-case adjudications or, at best, 
adjudications by category. Each case will involve the same plethora of questions 
with a different set of answers. Was a Stowers 
demand made? Did the insurer have the unilateral right to settle and was consent 
of the insured obtained to the settlement? Who controlled the defense? Who 
initiated and controlled the settlement discussions? Did the insurer give the 
insured the option to assume its own defense? Then the courts’ balancing will 
begin. Instead, I believe the parties’ contractual relationship should govern an 
insurer’s right to reimbursement. These other factors may be central to other 
issues that arise between insurers and insureds, but 
should not be central to a right of reimbursement.
This 
case raises a tangled mound of considerations. The Court deftly traverses the 
multitude of policies, incentives, and equities to reach a decision. See, 
e.g., Am. Physicians Ins. Exch. v. Garcia, 876 S.W.2d 842 (Tex. 
1994); Arnold, 725 S.W.2d 165; Stowers, 
15 S.W.2d 544; see also Blue Ridge Ins., 22 P.3d 313. Frank’s Casing 
acknowledges that decisions in reimbursement cases are “based on a balancing of 
policy considerations applicable to the relationship between an insurer and its 
insured.” If our analysis of this reimbursement issue were based on the 
agreements between the parties, the law in this area would be less perplexing 
and more predictable.
 
______________________________
J. 
Dale Wainwright
Justice
 
 
OPINION 
DELIVERED: May 27, 2005




[1] The insurance policy in this case is silent as to the 
insurer’s right to reimbursement.

[2] Frank’s Casing’s also complains that it had only a few 
hours to study the proposed settlement from Excess Underwriters. This complaint 
carries little weight as it was Frank’s Casing that imposed the February 23 
deadline on the settlement negotiations in its February 19 
letter.

[3] Even accepting, arguendo, Justice O’Neill’s position that Frank’s 
Casing can reject a term of an accepted agreement, the facts still undercut her 
conclusion. Frank’s Casing never asserted that it objected to the reimbursement 
term in Excess Underwriter’s settlement offer. Even at the trial court hearing 
to enter the settlement on the record, Frank’s Casing asserted only that Excess 
Underwriters waived or was estopped from contesting 
the insurance coverage issues. Its briefing is careful to only make the factual 
claim that it objected to a contest to coverage. Thus, contrary to Justice O’Neill’s suggestion, Frank’s Casing 
did not object to or reserve for court determination the reimbursement issue in 
the settlement. This issue is not a central part of my writing because it was 
not raised by the parties.